No. 88-14

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

_____

STATE OF MONTANA,

        Plaintiff and Respondent,

  -vs-

JACKIE WAYNE BURK,

        Defendant and Appellant.

_____

APPEAL FROM:  District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable James B. Wheelis, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

    J. Dirk Beccari, Missoula, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
Barbara Claassen, Asst. Atty. General, Helena
Robert L Deschamps, III, County Attorney, Missoula,
Montana; Betty Wing, Deputy County Attorney

_____

Submitted on Briefs:  Sept. 1, 1988

Decided: September 26, 1988

Filed: SEP 2 6 1988

*Ethel M. Harrison*

_____
Clerk

Mr. Chief Justice J. A. Turnage delivered the Opinion of the Court.

Jackie Wayne Burk appeals his conviction of sexual intercourse without consent, § 45-5-503, Montana Code Annotated. He was tried and convicted in May 1987 in the Fourth Judicial District, Missoula County, Honorable James B. Wheelis presiding. Burk was sentenced to twenty-five years in the Montana State Prison for his conviction of sexual intercourse without consent, to run consecutively with an additional ten-year sentence imposed for use of a weapon in the commission of the offense. The total Montana sentence imposed was to run concurrently with a previous Idaho sentence on an unrelated matter. We affirm.

The issue on appeal is whether the District Court erred in allowing the Missoula County Attorney to present evidence of defendant's absence from the first scheduled trial on this matter along with an accompanying jury instruction on flight.

On December 21, 1985, defendant, age twenty-eight, went on a date with T.R., the complaining witness, age eighteen. Defendant picked her up at her house in Clinton and took her to a Christmas party in Missoula. Both consumed alcohol and defendant "smoked a joint": a marijuana cigarette. When the party dwindled, they left in search of another Christmas party to be held by friends of Burk. After this point, the details are hotly disputed, and there is no agreement as to what transpired over the next several hours.

After a car wreck in Pattee Canyon at approximately 1:00 a.m., Burk and T.R. were picked up by passersby in a Bronco. Burk forgot his coat in the wrecked car. T.R. wanted to go to the hospital because of the injuries to her head and face she received when Burk's car went off the road and slammed into a tree. But, at Burk's insistence, they were dropped off at the Babbit residence in Milltown. Unable

2

to awaken the Babbits for assistance, they went to a neighboring trailer to use the phone. The trailer had no phone. Burk then lost track of T.R. for a short time but discovered her outside on the road exiting the trailer park. Burk testified that T.R. was going to walk across the field to the IGA in Milltown to call her parents for a ride home and she thought it best that he not be there. Defendant testified that he did not see T.R. again that night and was unaware of any incident which may have happened to her until the officers arrested him at about 4:30 a.m. while he was attempting to retrieve his car from the Pattee Canyon ditch.

T.R. relates a vastly different story of what happened to her in the early morning hours of December 22, 1985. Finding the IGA pay phone jammed, T.R. crossed the street and phoned her parents from a local business. It was 2:24 a.m. She asked her parents for a ride home and was waiting for them at the IGA when Burk reappeared.

He was now wearing dark blue snow clothing. He convinced T.R. that the Babbits, who had just given him the coat, had phoned her parents and that she was now supposed to go with Burk and wait inside at the Babbits' for her parents. Believing Burk's story, T.R. started off across the field again with Burk. As they walked across the walking bridge in Milltown Burk commented to her how easy it would be to push someone off the bridge to their death and make it look like an accident. T.R. took this as a threat.

After they crossed the bridge, Burk wanted to go under the bridge to "smoke a joint." T.R. refused. Burk then told her she could go willingly or under force and with that he wrestled her down the embankment. T.R. testified that she landed on some bushes and rocks. She sat on the rocks while Burk smoked his cigarette. He then tried to kiss her but she refused. Burk tried to kiss her again and crawled on top of

3

her. T.R. scratched his face. Angered, Burk told her that she could do this willingly or under force, and he then pulled a knife out of his pocket. T.R. testified that the knife blade was six inches in length. He rubbed the knife along her hair, ear and neck. He then took off his snow jacket and instructed her to lie on it. He pulled up her shirt and bit her right breast. T.R. testified that out of fear for her life, she was still and passive while Burk pulled down her pants and penetrated her. Burk then stated it would not be fun if T.R. was not going to move, so he stood up, pulled up his pants and left.

T.R. then went toward a light that was on in the trailer park. From the trailer, she phoned her parents again and told them she had been in two car wrecks, raped and threatened with murder. Her mother called 911 and within minutes a sheriff's officer picked up T.R. She gave a full description of Burk and the location of his car. Burk was apprehended by other officers at 4:30 a.m. at the location of his car as given by T.R.

The officers transported T.R. to St. Patrick's Hospital where a rape protocol kit examination was performed and the evidence preserved. T.R. was taken from the hospital to the sheriff's department for a statement and some further questioning.

The evidence at trial from the rape protocol exam revealed sperm, four to six hours old, on T.R.'s underwear which matched the sperm that was also found on defendant's underwear. Expert serologist testimony revealed that 30 percent of the male population had Burk's blood and semen type so that this match up was not identity perfect. Rather, it was a probability test showing that defendant was definitely within the 30 percent group type of men as possible

4

assailants.  Examination by Dr. Girard revealed a lesion on T.R.'s right breast consistent with a bite mark.

Testimony from Estella Harris, whose phone T.R. used at 4:00 a.m., related that T.R. showed up on their door step crying and hysterical.  She requested to use the phone, her clothes were dirty, she had dirt and twigs in her hair.  She stated that she had just been raped.

Officers investigating the crime scene under the bridge found tennis shoe prints matching the same shoes that Burk was wearing.  Also clothing patterns in the dirt near the rocks on the river bank were found.  Additionally, when apprehended by officers in Pattee Canyon, Burk was wearing the dark ski jacket and had a knife in his pocket.

At trial the prosecution further introduced evidence of the June 4, 1986, original trial date for which defendant failed to appear.  Defendant appeared the next day with an implausible story of an automobile accident the day before and the resultant disorientation which prevented his appearance.

The prosecution sought to show guilt by conduct of defendant's attempt to avoid prosecution.  However, defendant appeared at the courthouse the following day and was arrested.  Defense counsel objected to the introduction of his absence as evidence of flight.  The trial judge allowed the testimony and the jury was allowed to hear defendant's tale. The jury was also given an instruction as to the use of flight evidence, from which they could infer a consciousness of guilt.

The jury convicted Burk of sexual intercourse without consent.  Burk appeals.

## I. EVIDENCE OF FLIGHT

The tension surrounding evidence of flight usually involves the issue of immediacy. Flight is an attempt to avoid arrest or prosecution. Gann v. State (Ind. 1988), 521 N.Ed.2d 330. Evidence of such is used to prove guilt by conduct. State v. Charlo (Mont. 1987), 735 P.2d 278, 44 St.Rep. 597; see also McCormick on Evidence, § 271 at 803 (3d Ed. 1984). Through the use of an accompanying instruction, the jury is allowed to infer a consciousness of guilt from evidence of flight. Charlo, 735 P.2d at 282, 44 St.Rep. at 603.

In the instant case, immediacy is not an issue. Because it was several months after the arrest and charges that defendant disappeared, the inference that defendant tried to escape arrest is negated.

However, we are not convinced that the evidence negates the possibility that defendant was trying to avoid prosecution, since he disappeared on the day of trial. Thus, the immediacy element is not at issue.

It should be noted, however, that a defendant must do more than merely fail to show up for the flight evidence to be proper. United States v. Sanchez (2nd Cir. 1986), 790 F.2d 245; Commonwealth v. Babbs (Pa. Sup. Ct. 1985), 499 A.2d 1111. In the instant case, the defendant's nonappearance at his trial was coupled with the incredible story which he recounted to the authorities when he appeared the next day.

According to defendant's testimony, he was involved in a single car accident on Blue Mountain Road outside of Missoula while en route to the courthouse for his trial. While he was driving along the Bitterroot River, a cigarette which he was trying to put in the ashtray fell to the floor and began burning. Defendant reached over to grab it, swerved off the road and plunged his car into the river. He

testified that he became disoriented from hitting the trees and rocks as he was swept down river while trying to escape.

Once on dry land he hiked to Lolo Pass. (The opposite direction from Missoula, the place of trial.) It was midday when he reached the highway at the pass. Seeing no cars at all, he took off across country, headed for his residence in south Florence. He hiked the rest of that day and all through the night in the rain and hail. The next day he appeared at the courthouse in Missoula, dry, calm and oriented, to explain his absence to the judge. This is the story which Burk also told the jury at his second trial in May 1987.

At trial, the prosecution introduced evidence by Officer Reed that although the river had been searched repeatedly by the sheriff's department, even during low water periods, no evidence of a car wreck was ever found and defendant's car was not retrieved.

Officer Bell, an officer familiar with that area, testified that it would take five days and nights to hike the territory allegedly covered by the defendant on June 4, 1986. Through the officer's testimony, defendant's story was discounted on several points. In light of Officer Bell's testimony, coupled with Officer Reed's testimony and no car ever being found in the river, defendant's story seems inherently unbelievable. It is reasonable that a jury could infer a consciousness of guilt by Burk's absence coupled with this story.

A District Court's ruling on the admissibility of certain evidence will not be disturbed absent a showing of an abuse of discretion. Cooper v. Roston (Mont. 1988), 756 P.2d 1125, 45 St.Rep. 978. The trial judge in this case heard the defendant's testimony in a June 1986 hearing and held an _in camera_ hearing in May 1987 at which the State made an

additional offer of proof before the judge ruled on its admissibility. Under these facts, defendant has failed to meet his burden of proof that the district judge abused his discretion in allowing the flight evidence.

Prosecutors introducing questionable evidence to prove guilt beyond a reasonable doubt are inviting issues of reversible error. In the instant case, it should be noted that a jury conviction easily could have been sustained from the substantial credible testimonial and scientific evidence against defendant which was produced at trial, notwithstanding the flight evidence. Thus, at most, the unnecessary flight evidence would have been harmless error had it been determined to be inappropriate. However, because there was more than mere absence on the part of the defendant and no issue of immediacy, the flight evidence was proper.

## II. FLIGHT INSTRUCTION

The judge instructed the jury on the evidence as follows:

> If you are satisfied that the crime charged in the information has been committed by someone, then you may take into consideration any testimony showing or tending to show flight by the defendant. This testimony may be considered by the jury as a circumstance tending to prove a consciousness of guilt, but it is not sufficient of itself to prove guilt. The weight to be given such circumstances and significance, if any, to be attached to it, are matters for the jury to determine.

A jury instruction is proper when it is "relevant to evidence or issues in a case and when it is supported by some evidence or some logical inference from other evidence presented at trial." Charlo, 735 P.2d at 281, 44 St.Rep. at 602.

8

(Emphasis added.) It is clear from the foregoing discussion of the evidence adduced at trial that this instruction was definitely supported by the evidence. Further, the instruction was a correct statement of the law. Indeed the instruction was taken verbatim from this Court's opinion in Charlo.

Defense counsel next argues that it is legally inadmissible under Rule 403, M.R.Evid., arguing that its probative value is substantially outweighed by its prejudicial effect, and, the instruction improperly called additional attention to the issue of flight. We disagree.

There is probative value to flight evidence. "The fact that the jury could reasonably interpret the defendant's actions as flight in avoidance of prosecution would support the instruction on flight." Gann v. State (Ind. 1988), 521 N.E.2d at 334. Burk had ample opportunity to tell the jury his reasons for absence and to dissipate any prejudice the jury might attach to the fact that Burk was not present on June 4, 1986. Determining the credibility of Burk's story was properly left to the jury. The instruction itself cautions the jury that the significance, if any, of Burk's absence is for them alone to determine. We find no error in this instruction.

Although the flight evidence was unnecessary in this case, the District Court did not abuse its discretion in allowing it. The jury instruction properly accompanied the flight evidence.

Judgment affirmed.

_____
Chief Justice

We concur:

_John Conway Harrison_

_William E. Hunt_

_Fred J. Weber_

_John C. Sheehy_
Justices