No. 96-592 and 96-727

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 289

STATE OF MONTANA,

Plaintiff and Respondent,

v.

DANIEL MARTIN JOHNSON,

Defendant and Appellant.

APPEAL FROM: District Court of the Third Judicial District,

In and for the County of Powell,

The Honorable Ted L. Mizner, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Edmund F. Sheehy, Jr., Helena, Montana

For Respondent:

Joseph P. Mazurek, Attorney General, John Paulson, Assistant Attorney General, Helena, Montana; Christopher G. Miller, Powell County Attorney, Deer Lodge, Montana, John P. Connor, Jr., Special Deputy Powell County Attorney, Helena, Montana

Heard: June 25, 1998

Submitted: June 30, 1998

Decided: November 24, 1998

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

**¶1. Daniel Martin Johnson (Johnson) was convicted by a jury in the District Court for the Third Judicial District, Powell County, of deliberate homicide and sentenced to death. Johnson appeals his conviction and, pursuant to § 46-18-308, MCA, his appeal is consolidated with this Court's automatic review of his death sentence. We affirm.**

**¶2. Johnson raises the following issues in his appeal of his conviction on the charge of deliberate homicide:**

**¶3. 1. Whether the District Court properly instructed the jury on "flight" and "concealment."**

**¶4. 2. Whether there was sufficient evidence to support Johnson's conviction of deliberate homicide.**

**¶5. We address the following issues in our review of the death sentence:**

**¶6. 3. Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factors.**

**¶7. 4. Whether the evidence supports the District Court's findings of the nonexistence of mitigating circumstances as enumerated in § 46-18-304, MCA.**

¶8. 5. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases.

## Factual and Procedural Background

¶9. On September 10, 1995, Andrew Joseph Burgess (Burgess), an inmate at Montana State Prison (MSP), was severely beaten in a bathroom stall in the high-security or "high-side" recreation yard at MSP. He died two days later.

¶10. The high-side recreation yard contains a softball field, a basketball court and horseshoe pits surrounded by a jogging track. Next to the basketball court is a small building used to store recreation equipment. On one end of that building are three small stall-like bathrooms each containing a single stainless steel toilet. These bathrooms face toward the softball field and their doors are divided in half so that the top half of each stall may be secured open. This allows the correctional officers to observe inside the stalls and still afford the inmates some degree of privacy. Prior to allowing the inmates into the yard, officers open the doors to the bathrooms.

¶11. On the day Burgess was beaten, inmates from two of the close-security housing units, Close 1 and Close 3, entered the recreation yard at about 5 p.m. for an exercise period. Correctional Officers Scott McNeil and William Hogart, along with Recreational Officer Ray Hoffenbacker, were responsible for monitoring the activities of the inmates during that exercise period. Officer McNeil opened the bathrooms and, once the inmates were in the yard and the recreation equipment was distributed, Officers McNeil, Hogart and Hoffenbacker walked the track in a clockwise direction.

¶12. The officers later testified that as they came around the track near the back stop of the baseball field, they noticed a disturbance inside one of the bathroom stalls across the field. Officer McNeil testified that, through the open top door of the middle stall, he could see an inmate moving up and down. Officer Hogart testified that he saw the inmate bending over. Officer Hoffenbacker testified that the inmate had his back toward the officers and that the inmate appeared to be swinging at something. Officer Hoffenbacker also testified that he could hear a pounding noise and he assumed that the inmate was beating on the toilet.

¶13. The three officers left the track and began walking toward the bathrooms. As

they approached, the inmate inside the middle stall stopped what he was doing, put on a coat and dark glasses, pulled his cap down, exited the stall, pulled the door closed, and walked quickly away. All three officers testified that they recognized that the inmate was Johnson.

¶14. Officer Hoffenbacker followed Johnson around the building while Officers McNeil and Hogart went into the stall to investigate. There they discovered an inmate lying on the floor in a pool of blood, his head and face beaten beyond recognition. Near the inmate's body was a bloody horseshoe. Officer Hogart called the prison infirmary on his radio and remained at the scene with the injured man while Officer McNeil rushed to assist Officer Hoffenbacker.

¶15. When Officer Hoffenbacker heard Officer Hogart say that there was a man down, he ordered Johnson to stop. Johnson, instead of doing as the officer ordered, began to run toward Close 1, his housing unit. Officer Albert Cox was the floor officer in control of the movement of inmates between Close 1 and the recreation yard that afternoon. He caught Johnson as Johnson was entering the building and held him until Officers Hoffenbacker and McNeil, along with several other officers, arrived. Johnson struggled with the officers as they attempted to place him in handcuffs. Officers McNeil and Cox later testified that they noticed blood on Johnson's hands and clothing.

¶16. After Johnson was apprehended, the rest of the inmates in the recreation yard were ordered to return to their housing units. Officers conducted a pat-down search of each inmate as they entered the units, but they did not find any blood on any other inmates. In addition, officers searched the cells in each unit, but found nothing. A count of the inmates in the two units led officers to identify the injured inmate as Burgess.

¶17. Eunice Cole, a staff nurse at the prison infirmary, and Kenneth Linsey, an infirmary aide, responded to the call for assistance in the yard. They found Burgess bleeding and slumped over in a pool of blood. His face was distorted and swollen and his head was soft and mushy to the touch. Nurse Cole wrapped Burgess's head in bandages and ordered that he be transported to the infirmary. The infirmary staff was unable to control the bleeding hence Burgess was taken to St. James Community Hospital in Butte. Burgess's head wounds were treated and closed, but his brain had been severely injured. The neurosurgeon who operated on Burgess found depressed

skull fracturing above his right eyebrow, over his right temporal area, and on the right back side of his head. The bruising and swelling resulting from the blunt force injuries caused the blood flow into the brain to cease and the doctors determined that Burgess was brain-dead. With the consent of his family, Burgess eventually was removed from a ventilator whereupon his heart stopped beating. He died on September 12, 1995, two days after the assault.

¶18. An autopsy conducted by the state medical examiner disclosed that Burgess had sustained 26 wounds or lacerations, mostly to the right side of his head. These lacerations required nearly 200 surgical staples or sutures to close. The medical examiner concluded that Burgess had died as a result of multiple blunt-force injuries to the head.

¶19. Tom Blaz and Mike Micu, investigators for the Montana Department of Corrections, were called to the prison to investigate the assault. They secured the middle bathroom so that it could be processed by personnel from the state crime lab. They also looked in the other two bathroom stalls, but did not find any sign of blood on the floor or any other evidence. They searched the recreation yard and found nothing irregular.

¶20. Blaz and Micu interviewed Johnson after advising him of his rights. During that interview, Blaz and Micu noticed that Johnson had blood stains on his clothing, his hands, his watch and his glasses. When they called Johnson's attention to the blood on his hands, he tried to remove it by rubbing his hands together. He also tried to rub the blood off of his watch. Blaz and Micu secured Johnson's clothing, watch and glasses as evidence.

¶21. During that interview and again during his testimony at trial, Johnson claimed that he had not killed Burgess and that he had gotten blood on himself when he had attempted to assist Burgess. Johnson explained that earlier that day, another inmate, Pat Tracy, had told Johnson that he had received a letter from Johnson's ex-wife and that Tracy agreed to bring the letter to the yard that afternoon. Johnson stated that when yard was called out, he took a lap on the track and then sat at the picnic table facing the baseball field to wait for Tracy. When Tracy joined him at the picnic table, Johnson read the letter and the two discussed it. Johnson claimed that while they were engaged in that conversation, another inmate, Bill Ries, approached them and said that Johnson's "kid was down." "Kid" in prison parlance refers to a weaker

inmate who has an emotional or other relationship with a stronger inmate and receives protection in return for favors. Johnson acknowledged that Burgess had been his "kid" and that they had had a sexual relationship while they were cell mates in 1991.

¶22. Johnson testified that after he heard that his "kid" was down, he left the picnic table and went to the middle restroom stall where he found a man whom he could not identify lying in a pool of blood. Johnson claimed that the man grabbed at his leg and that when he tried to help the man up, the man fell back down into the pool of blood. Johnson contended that that is how he got the blood smears and spatters on his pants. Johnson also testified that when he looked up and saw the officers coming towards the bathroom, he panicked. He claimed that he left the scene and headed for Close 1 because he wanted to talk to Officer Cox whom he trusted.

¶23. On September 21, 1995, the State charged Johnson with the offense of deliberate homicide in violation of § 45-5-102(1)(a), MCA. Johnson moved for a change of venire due to adverse publicity in a local newspaper. The District Court granted the motion and the case was tried in Powell County by a jury selected from Lewis and Clark County. Trial began on January 26, 1996, and on February 1, 1996, the jury returned a verdict of guilty on the charge of deliberate homicide.

¶24. On July 9, 1996, the District Court held a hearing to determine the existence or nonexistence of aggravating and mitigating circumstances for the purpose of determining the sentence to be imposed. The State presented evidence that two of the statutory subsections on aggravating circumstances applied in this case:

(1) The offense was deliberate homicide and was committed by a person serving a sentence of imprisonment in the state prison.

(2) The offense was deliberate homicide and was committed by a defendant who had been previously convicted of another deliberate homicide.

Section 46-18-303, MCA.

¶25. Johnson conceded that these two aggravating circumstances existed, however, he contended that a mitigating circumstance sufficient to call for leniency existed as well. Two MSP inmates testified at the hearing that Johnson had not been involved in

beating Burgess. In addition, Johnson's attorney produced, over Johnson's objection, a letter written by Johnson wherein he claimed that three other inmates had beaten Burgess over a drug deal. Johnson's attorney also introduced Johnson's deposition, taken between the time of his trial and the hearing, in which he again contended that three other inmates had beaten Burgess and that he had only acted as a lookout. Thus, Johnson argued that § 46-18-304(1)(f), MCA, applied in mitigation of his sentence. Section 46-18-304(1)(f), MCA, provides:

(1) Mitigating circumstances are any of the following:

. . .

(f) The defendant was an accomplice in an offense committed by another person, and the defendant's participation was relatively minor.

¶26. On September 26, 1996, the District Court entered its Findings of Fact, Conclusions of Law, Judgment and Sentence, wherein the court found the existence of two statutory aggravating circumstances and no mitigating circumstances sufficient to call for leniency. The court sentenced Johnson to death and set an execution date of November 20, 1996. Johnson appealed and the sentence was stayed pending resolution of his appeal and automatic review.

## Issue 1.

¶27. *Whether the District Court properly instructed the jury on "flight" and "concealment."*

¶28. The standard of review of jury instructions in criminal cases is whether the instructions, as a whole, fully and fairly instruct the jury on the law applicable to the case. *State v. Weaver*, 1998 MT 167, ¶ 28, 964 P.2d 713, ¶ 28, 55 St.Rep. 668, ¶ 28 (citing *State v. Patton* (1996), 280 Mont. 278, 286, 930 P.2d 635, 639). *See also State v. Brandon* (1994), 264 Mont. 231, 237, 870 P.2d 734, 737; *State v. Lundblade* (1981), 191 Mont. 526, 529-30, 625 P.2d 545, 548. Moreover, we recognize that a district court has broad discretion when it instructs a jury. *Weaver*, ¶ 28. *See also State v. Ross* (1995), 269 Mont. 347, 358, 889 P.2d 161, 167.

¶29. At trial, the State presented evidence and testimony that, when Johnson realized

the officers had seen him, he hurriedly left the bathroom stall and, when one of the officers ordered him to stop, Johnson instead ran toward his housing unit. Thus, the State proposed the following jury instruction on "flight" which the District Court gave over Johnson's objection:

If you are satisfied that the crime charged in the information has been committed by someone, then you may take into consideration any testimony showing, or tending to show, flight by the defendant. This testimony may be considered by the jury as a circumstance tending to prove a consciousness of guilt, but is not sufficient of itself to prove guilt. The weight to be given such circumstance and significance if any, to be attached to it, are matters for the jury to determine.

¶30. The State also presented evidence and testimony at trial that, as Johnson left the bathroom stall, he put on his coat, and his sunglasses and pulled his hat down. In addition, when officers pointed out to Johnson that he had blood on his hands, he attempted to rub it off. The State also presented evidence and testimony that a blood stain on Johnson's pants had been diluted with water as though he had tried to wash it out. Thus, the State proposed the following jury instruction on "concealment" which the District Court also gave over Johnson's objection:

If you are satisfied that the crime charged in the information has been committed by someone, then you may take into consideration any testimony showing, or tending to show, concealment by the defendant. This testimony may be considered by the jury as a circumstance tending to prove a consciousness of guilt, but is not sufficient of itself to prove guilt. The weight to be given such circumstance and significance if any, to be attached to it, are matters for the jury to determine.

¶31. Johnson argues on appeal that the District Court erred in giving these instructions because there can be no "flight" in a prison environment and because rubbing blood off of his hands while he was in custody cannot be considered "concealment." Moreover, Johnson contends that the State did not explain in its closing argument how the two instructions at issue here relate to the evidence presented. He argues that these instructions are an improper comment on the evidence and that they prejudicially affected his substantial right to a fair trial because a reasonable juror could have interpreted them as requiring the jury to find Johnson guilty for running and for pulling his hat down and rubbing his hands.

¶32. We recently examined identical instructions in *Patton*, 280 Mont. at 289, 930 P.2d at 641, wherein we noted that the language of these instructions was taken verbatim from the 1990 Montana Criminal Jury Instructions published by the State Bar of Montana and based upon the authority of *State v. Walker* (1966), 148 Mont 216, 419 P.2d 300. We approved the language use and constitutionality of these instructions in *Patton* and we noted that this Court has repeatedly upheld the use of jury instructions regarding a defendant's flight. *Patton*, 280 Mont. at 289, 930 P.2d at 641. See *also State v. Byers* (1993), 261 Mont. 17, 861 P.2d 860, *overruled on other grounds by State v. Egelhoff* (1995), 272 Mont. 114, 900 P.2d 260 and *State v. Rothacher* (1995), 272 Mont. 303, 901 P.2d 82; *State v Campbell* (1990), 241 Mont. 323, 787 P.2d 329; *State v. Kills on Top* (1990), 241 Mont. 378, 787 P.2d 336, *cert. denied*, 516 U.S. 1177, 116 S.Ct. 1273, 134 L.Ed.2d 220 (1996); *State v. Burk* (1988), 234 Mont. 119, 761 P.2d 825; *State v. Charlo* (1987), 226 Mont. 213, 735 P.2d 278. Additionally, we held in *Byers* that this instruction on flight is not an improper comment by the court on the evidence. *Byers*, 261 Mont. at 45, 861 P.2d at 877.

¶33. We also noted in *Patton* that although most of the cases cited dealt with flight, "it is well established that evidence of concealment is 'treated in the same manner as flight.'" *Patton*, 280 Mont. at 289 , 930 P.2d at 641 (citing *State v. Shaw* (1982), 199 Mont. 248, 648 P.2d 287; *State v. Armstrong* (1980), 189 Mont. 407, 616 P.2d 341; *State v. Adair* (Ariz. 1970), 469 P.2d 823). Furthermore, we upheld the use of an instruction on concealment in another homicide case (which coincidentally involved Johnson) wherein evidence was destroyed. *State v. Dannels* (1987), 226 Mont. 80, 734 P.2d 188.

¶34. Contrary to Johnson's argument that a reasonable juror could interpret the instructions to require them to find Johnson guilty if they found flight or concealment, the instructions are not mandatory. *Patton*, 280 Mont. at 290, 930 P.2d at 642. The instructions clearly state that the jury *may* take into consideration testimony regarding flight or concealment. As we stated in *Patton*:

[The instructions on flight and concealment] merely instructed the jury to determine the weight and significance, if any, of the evidence of Patton's flight and concealment; and they plainly instructed that evidence of his flight and concealment "is not sufficient of itself to prove guilt."

*Patton, 280 Mont. at 290, 930 P.2d at 642.*

¶35. Moreover, we stated in *Patton* that a jury instruction "may be given when it is relevant to evidence or issues in a case, and when it is supported either by some evidence or some logical inference from other evidence presented at trial." *Patton*, 280 Mont at 289, 930 P.2d at 641-42 (citing *Charlo*, 226 Mont. at 218-19, 735 P.2d at 281; *State v. Kirkaldie* (1978), 179 Mont. 283, 292, 587 P.2d 1298, 1304). Here, Johnson's flight and concealment were relevant to the issue of the extent of Johnson's knowledge of and involvement in Burgess's homicide. Additionally, the evidence was sufficient to support both instructions because Johnson put on his coat, and his sunglasses, pulled his hat down, ran from the scene after being ordered to stop, and then attempted to rub blood off of his hands.

¶36. Johnson argues that the instruction on "flight" was error because there can be no "flight" in a prison environment. The evidence introduced at trial is uncontroverted that Johnson ran from the crime scene. The fact that he could not have gone far because he was in prison does not alter the fact that he fled.

The act of running away which constitutes a flight in law and thus affords a basis for an inference of consciousness of guilt . . . requires neither a physical act of running nor a far-away haven.

*Walker*, 148 Mont. at 226, 419 P.2d at 306 (citation omitted). As the State correctly points out, even in the limited environment of a prison, a defendant may fly to wherever he thinks is safe to dispose of evidence or avoid detection. Only some departure from a crime scene is necessary to support giving an instruction on "flight".

¶37. Johnson also argues that the act of rubbing his hands cannot constitute "concealment" under the dictionary definition of that term. He cites *Webster's Dictionary* wherein concealment is defined as: (1) to prevent disclosure or recognition of; and (2) to place out of sight. Contrary to Johnson's assertions, the conduct of rubbing his hands fits squarely within both of these definitions.

¶38. Accordingly, we hold that the District Court did not abuse its discretion when it instructed the jury on "flight" and "concealment."

## Issue 2.

¶39. *Whether there was sufficient evidence to support Johnson's conviction of*

*deliberate homicide.*

¶40. At the close of the State's case in chief, Johnson moved for a directed verdict asserting that the State failed to present sufficient evidence by which the jury could find that Johnson purposely and knowingly caused Burgess's death. The District Court denied Johnson's motion and the jury subsequently found Johnson guilty of deliberate homicide.

¶41. We review the sufficiency of the evidence to sustain a guilty verdict in a criminal case to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *State v. Sattler*, 1998 MT 57, ¶ 56, 956 P.2d 54, ¶ 56, 55 St.Rep. 230, ¶ 56 (citing *State v. Richards* (1995), 274 Mont 180, 184, 906 P.2d 222, 224). "It is within the province of the finder of fact to weigh the evidence presented and determine the credibility of the witness; in the event of conflicting evidence on factual issues, the trier of fact determines which will prevail." *Sattler*, ¶ 55 (citing *State v. Flack* (1993), 260 Mont. 181, 189, 860 P.2d 89, 94). "We review the jury's verdict only to determine whether it is supported by sufficient evidence, not to determine whether there was evidence to support a different verdict." *Sattler*, ¶ 60.

¶42. Johnson argues that the State failed to establish, with sufficient evidence, that he was the person who beat Burgess and caused his death. He maintains that it was not proven that the crime could have occurred within the time frame suggested by some of the evidence or that the blood spatter on his clothing could not have happened when, as he testified, he attempted to help Burgess get up. In addition, Johnson points out that no one saw either Burgess or Johnson enter the restroom.

¶43. Granted the evidence against Johnson was circumstantial, nevertheless, it was strong and, while Johnson has different views of the evidence and attempts to explain his view, all of this was considered by the jury and rejected. Circumstantial evidence alone is sufficient to obtain a conviction. *State v. Lancione*, 1998 MT 84, ¶ 37, 956 P.2d 1358, ¶ 37, 55 St.Rep. 344, ¶ 37 (citing *State v. Buckingham* (1989), 240 Mont. 252, 260, 783 P.2d 1331, 1337). "Circumstantial evidence must only be of such a 'quality and quantity as to legally justify a jury in determining guilt beyond a reasonable doubt,' and all the facts and circumstances must be considered collectively." *Lancione*, ¶ 37 (quoting *State v. Weaver* (1981), 195 Mont. 481, 495, 637 P.2d 23, 31).

¶44. The evidence against Johnson included the testimony of another MSP inmate who recounted that, while he was playing horseshoes with three other inmates, he saw Johnson walk over to the center horseshoe pit, pick up a horseshoe, stuff it in his pants, and then walk toward the basketball courts. This inmate testified that he did not see what Johnson did with the horseshoe, but five or ten minutes after Johnson left, the siren went off indicating that yard was being called in.

¶45. In addition, three correctional officers testified that they saw Johnson creating a disturbance in the same bathroom stall where Burgess was found. All three of these officers testified that they saw Johnson moving up and down and bending over. One officer testified that he saw Johnson making swinging motions and heard something being struck. Furthermore, when Johnson saw the officers approach, he tried to disguise his identity and flee the scene.

¶46. Finally, Julie Long, a forensic serologist with the State Crime Lab, testified that the blood on Johnson's clothing and personal items was consistent with Burgess's blood. She

also testified that the blood spatters on Johnson's pants were consistent with being in close proximity to a bloody object being struck with medium force and close to the ground. None of the other inmates in the recreation yard that afternoon had any blood on their clothing or showed any evidence of involvement in the homicide.

¶47. Johnson also argues that the State failed to account for certain evidence found at the crime scene such as a bloody footprint that was not matched to Johnson and an envelope with a fingerprint which did not match either Johnson or Burgess. The State counters that it is not required to account for everything found at a crime scene. While a criminal defendant has a constitutional right to obtain exculpatory evidence, police officers are not required to take initiative or even assist the defendant with procuring evidence on his own behalf. *State v. Belgarde*, 1998 MT 152, ¶ 16, 962 P.2d 571, ¶ 16, 55 St.Rep. 590, ¶ 16 (citing *State v. Sadowski* (1991), 247 Mont. 63, 79, 805 P.2d 537, 546). After Burgess was discovered, numerous correctional officers and infirmary personnel were in and out of that bathroom stall, anyone of whom could have made that footprint or dropped the envelope.

¶48. It was the jury's function to weigh the evidence presented and to judge the credibility of the witnesses and we conclude that, on this record, the jury could have

found the essential elements of the crime beyond a reasonable doubt. Accordingly, we hold that there was sufficient evidence to support Johnson's conviction on the charge of deliberate homicide and that the District Court did not err in denying Johnson's motion for a directed verdict.

## Issue 3

¶49. *Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factors.*

¶50. Section 46-18-307, MCA, mandates that we automatically review every death sentence imposed under Montana law. In doing so we must determine "whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." Section 46-18-310(1)(a), MCA. This review acts as a check against the random or arbitrary imposition of the death penalty. *State v. Langford* (1991), 248 Mont. 420, 436, 813 P.2d 936, 948, *cert. denied*, 118 S.Ct. 908, 139 L.Ed.2d 923 (1998) (citing *Gregg v. Georgia* (1976), 428 U.S. 153, 206, 96 S.Ct. 2909, 2940, 49 L. Ed.2d 859).

¶51. Johnson does not suggest that the judge in this case was improperly influenced by any inflammatory or inaccurate media coverage or that the judge's comments at any time during the proceedings reflect any improper or arbitrary influence. Nor does Johnson suggest that the fear of community objection affected the judge's sentencing decision. Rather, Johnson argues that the death sentence in this case was imposed under the influence of passion, prejudice, and arbitrary factors because the District Court predicated its sentence upon Montana's correctional policy as set forth in § 46-18-101, MCA, and that that policy does not expressly provide for death as a punishment for any crime. Johnson's argument focuses upon the District Court's Finding of Fact No. 8, which states:

The Court has further considered the Correctional Policy of the State in sentencing offenders as set forth in Section 46-18-101, MCA. In that regard, the Court finds as follows:

a. This offense was a brutal, senseless murder committed with a weapon, a horseshoe, while the Defendant was already incarcerated in the prison on a prior homicide conviction.

b. The Defendant has an extensive criminal history which includes two armed robbery convictions. The Defendant fired a weapon at a store clerk during the commission of the second robbery. Defendant has also been found to be a persistent felony offender. After being placed on parole for only six months on the second armed robbery conviction, the Defendant committed his first deliberate homicide.

c. Although the Defendant's institutional record was good for approximately 1½ years prior to this homicide conviction, Defendant's overall record shows a pattern of disruptive, defiant and assaultive behavior which mirrors most of Defendant's young and adult life whether in or out of institutions.

d Defendant's prospects of rehabilitation at his current age of 41 years seem virtually nonexistent.

**¶52. While Johnson is correct in asserting that § 46-18-101, MCA, does not expressly discuss death as a punishment for criminal conduct, this statute also does not discuss most of the sentencing options that are allowed under Montana Law. *See* § 46-18-201, MCA. Section 46-18-101, MCA, is a general declaration of Montana's correctional policy by the Montana Legislature. It is based upon Article II, Section 28 of the Montana Constitution which provides, in part: "Laws for the punishment of crime shall be founded on the principles of prevention and reformation." This Court has already determined that Montana's death penalty statutes are not inconsistent with, or violative of, this provision of the Montana Constitution. *Langford,* 248 Mont. at 441, 813 P.2d at 951-52.**

**¶53. As the State points out, the District Court's Finding of Fact No. 8 reflects its consideration of the general principles in § 46-18-101(3), MCA, that a criminal defendant's sentence must be based primarily on the crime committed, the prospects of rehabilitation, the circumstances under which the crime was committed, and the criminal history of the offender. The District Court found that all of these factors weighed in favor of the imposition of a severe punishment in Johnson's case rather than leniency and, contrary to Johnson's suggestion, the court's reference to these policy guidelines does not indicate that the death sentence was imposed arbitrarily or with passion and prejudice. Rather, the court's analysis shows only that it carefully and dispassionately considered all of the evidence before it concluded that the death penalty was appropriate.**

¶54. Johnson further argues that the District Court engaged in speculation when it found that if the death penalty is not imposed, Johnson will almost certainly kill again. Johnson contends that the District Court ignored a psychological evaluation of Johnson wherein Dr. William Stratford came to a contrary conclusion. While this argument does not appear to be connected to any claim of passion, prejudice, or other arbitrary factors, nevertheless, the court's finding is supported by the evidence as Johnson has a long history of assaultive and predatory behavior both in and out of prison. Furthermore, the District Court, rather than ignoring Dr. Stratford's report, expressly mentioned that report in finding that simple incarceration would not be sufficient to control Johnson's violent behaviors.

¶55. Accordingly, based upon our review of the record, we hold that Johnson's sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor.

### Issue 4.

¶56. *Whether the evidence supports the District Court's findings of the nonexistence of mitigating circumstances as enumerated in § 46-18-304, MCA.*

¶57. The District Court determined that two aggravating circumstances existed in this case in that the offense was deliberate homicide and was (1) committed by a person serving a sentence of imprisonment in the state prison, § 46-18-303(1), MCA; and (2) committed by a defendant who had been previously convicted of another deliberate homicide, § 46-18-303(2), MCA. Johnson does not dispute either of these findings. Johnson does, however, dispute the District Court's conclusion that there are no mitigating circumstances sufficiently substantial to call for leniency as contemplated by § 46-18-305, MCA.

¶58. At the aggravation and mitigation hearing, Johnson offered a different account of his involvement in Burgess's death than what he had testified to at his trial. In a letter written by Johnson to his attorney and in a deposition taken of Johnson after his trial, Johnson stated that about three days before the incident, he learned that another inmate was planning to beat up Burgess over money Burgess owed that inmate for drugs. He also stated that on the day Burgess was killed, he saw Burgess enter the bathroom stall with two other inmates. After one of the inmates left the stall, Johnson went to investigate and saw the remaining inmate striking Burgess

with the horseshoe. Johnson claimed that Burgess was hit twice while Johnson was in the stall and that is how he got the blood spatters on his pants. Johnson stated that he ordered the assailant to leave and that he was attempting to help Burgess when he saw the guards approaching.

¶59. Johnson also offered on his own behalf, the testimony of inmate Timothy Braatan who claimed to have witnessed Burgess's beating. Braatan testified that, on the day Burgess was killed, he had heard there was a drug deal going down at the bathrooms. When Braatan went to the bathrooms to possibly buy some drugs, he saw an inmate striking another inmate who was lying on the bathroom floor. Braatan testified that Johnson was not the assailant and was not even in the bathroom stall at the time.

¶60. Johnson argued that this new version of his involvement in Burgess's death brought him within the scope § 46-18-304(1)(f), MCA, which provides for a mitigating circumstance where a defendant was an accomplice in an offense committed by another and the defendant's participation was relatively minor. The District Court, however, noted the considerable inconsistency between Johnson's new story and the blood evidence, the other physical evidence, and the eyewitness testimony of the three correctional officers. The court also noted that Johnson's witnesses were not consistent with Johnson's version of the facts. The court concurred in the jury's verdict and rejected the evidence offered by Johnson at the sentencing hearing. Hence, the court determined that § 45-18-304(1)(f), MCA, was not applicable.

¶61. Section 46-18-310(1)(b), MCA, requires this Court, on automatic review of a death sentence, to determine "whether the evidence supports the judge's finding of the existence or nonexistence of the aggravating or mitigating circumstances enumerated in 46-18-303 and 46-18-304." Our role under this subsection of the statute is not to reweigh the aggravating and mitigating circumstances, but to conduct an independent review of the trial court record to determine whether the evidence supports the sentencing judge's findings. *State v. Smith* (1996), 280 Mont. 158, 170, 931 P.2d 1272, 1279, *cert. denied*, 118 S.Ct. 410, 139 L.Ed.2d 314 (1997).

¶62. Johnson claimed that he was present in the bathroom for only two blows to Burgess's head, however, the blood evidence presented at trial showed that Johnson had a substantial amount of blood on his clothing, particularly his pants. In addition,

there was no blood found on any other inmate, in particular the inmate that Johnson claimed had actually killed Burgess. Johnson also claimed that immediately after the attack on Burgess, the assailant went into the adjacent bathroom stall to clean up, however, no blood was found in either of the other bathroom stalls.

¶63. Three correctional officers testified that they saw Johnson creating a disturbance in the bathroom stall and that he was moving up and down. They testified that they saw no other inmates in the area at that time. Furthermore, Johnson was seen carrying a horseshoe in the direction of the restrooms shortly before the assault on Burgess.

¶64. Finally, Johnson's witness at the sentencing hearing, Braatan, claimed that the assault had been completed by the time Johnson arrived at the bathroom, contrary to Johnson's own statement. Moreover, Braatan stated that he believed the officers lied about seeing Johnson in the bathroom because Johnson left the area long before the officers noticed anything wrong. This is also inconsistent with Johnson's own statement that he left the bathroom when he saw the officers approach.

¶65. Accordingly, after reviewing the trial court record, we hold that there is sufficient evidence to support the sentencing judge's finding that Johnson's later version of the incident is not credible and that the § 46-18-304(1)(f), MCA, mitigating circumstances do not exist.

¶66. Johnson also contends that § 46-18-304(2), MCA, the "catch all" provision of the mitigating circumstances statute, applies here, although he did not argue along these lines at the sentencing hearing. On appeal, Johnson argues that the District Court failed to properly consider, under this statutory provision, Johnson's institutional record, the testimony of two correctional officers that they did not perceive Johnson as a danger to other staff or inmates, or Dr. Stratford's report discussing Johnson's IQ and his childhood.

¶67. Contrary to Johnson's contentions, the District Court did consider these factors, albeit the court did not specifically state that it was considering these factors under the "catch all" provision. In its Finding of Fact No. 8, the court stated:

c. Although the Defendant's institutional record was good for approximately 1½ years prior to this homicide conviction, Defendant's overall record shows a pattern of disruptive,

defiant and assaultive behavior which mirrors most of Defendant's young and adult life whether in or out of institutions.

Additionally, in its ninth finding of fact (misnumbered as the court's second Finding of Fact No. 5), the court stated, in part:

If the penalty of death is not imposed it is virtually certain that Defendant will injure or kill other correctional staff or inmates, *notwithstanding the report of Dr. Stratford and the testimony of the correctional officers that was offered at the sentencing hearing.* [Emphasis added.]

And, finally, in its Finding of Fact No. 7, the court stated:

The Defendant has not proposed that any of the other mitigating factors set forth in Section 46-18-304, MCA, should apply to the circumstances of this case and the Court specifically finds that *none of the other mitigating factors are applicable.* [Emphasis added.]

**¶68. Furthermore, the sentencing court is not required to make findings on each piece of purportedly mitigating evidence produced; it is only required to consider all such evidence. *Sattler*, ¶ 88 (citations omitted). Since the District Court states that it found none of the other mitigating factors to be applicable in this case, we must assume that it did consider all purportedly mitigating evidence produced.**

**¶69. Accordingly, we hold that the District Court did consider all of the mitigating circumstances enumerated in § 46-18-304, MCA, and that sufficient evidence exists to support the court's finding of the nonexistence of any mitigating circumstance sufficient to call for leniency.**

## Issue 5.

**¶70. *Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases.***

**¶71. Under § 46-18-310(3), MCA (1995) (the statute in effect at the time Johnson was convicted and sentenced), this Court is required to determine "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." The statute also requires this Court**

to "include in its decision a reference to those similar cases it took into consideration."

¶72. In determining whether a death sentence is disproportionate, we review the gravity of the offense, the brutality with which it was committed, and the factors, if any, which lead to a call for leniency, with the purpose of making certain that there has been no discriminatory action on the part of the sentencing judge. *See State v. Coleman* (1979), 185 Mont. 299, 605 P.2d 1000, *cert. denied*, 446 U.S. 970, 100 S.Ct. 2952, 64 L.Ed.2d 831 (1980); *State v. Kills on Top* (1990), 243 Mont. 56, 793 P.2d 1273, *cert. denied*, 501 U.S. 1259, 111 S.Ct. 2910, 115 L.Ed.2d 1073 (1991).

¶73. In *Smith*, we stated that an evaluation of the proportionality of a death sentence is limited to consideration of those cases in which the death penalty was sought and a record exists concerning aggravating and mitigating circumstances. *Smith*, 280 Mont. at 179, 931 P.2d at 1285. Thus, the scope of our proportionality review in the case *sub judice* would necessarily include three similar death penalty cases, each involving a deliberate homicide committed by an individual while incarcerated. Those cases are: *State v. Turner* (1993), 262 Mont. 39, 864 P.2d 235, *cert. denied*, 513 U.S. 827, 115 S. Ct. 96, 130 L.Ed.2d 46 (1994); *State v. Gollehon* (1993), 262 Mont. 1, 864 P.2d 249, *cert. denied*, 513 U.S. 827, 115 S.Ct. 95, 130 L.Ed.2d 45 (1994); and *State v. Sattler*, 1998 MT 57, 956 P.2d 54, 55 St.Rep. 230.

¶74. The defendants in *Turner* and *Gollehon* were convicted of deliberate homicide by accountability for their participation in the beating death of another inmate at MSP. The evidence showed that both defendants used baseball bats to attack and beat the victim on the head and body. Both defendants committed the deliberate homicide while they were serving prison sentences and both had previously been convicted of deliberate homicide. In each case, there was no significant circumstance which mitigated the penalty.

¶75. In *Sattler*, the defendant was incarcerated in a county jail when he beat another jail inmate to death with a metal bar. This defendant also had a previous homicide conviction and, as in *Turner* and *Gollehon*, the mitigating circumstances supporting leniency for this defendant were insubstantial.

¶76. Johnson argues that, while it is true that the two aggravating circumstances found in *Turner*, *Gollehon,* and *Sattler* apply to Johnson, those three cases are

factually distinguishable from the facts surrounding Burgess's death. Johnson contends that, while Burgess was an inmate, was attacked with a weapon, and was beaten to death by blows to the head, there were no other blows to other areas of his body as was the case in *Turner*, *Gollehon,* and *Sattler*. Johnson also contends that, unlike *Turner*, *Gollehon* and *Sattler*, one blow was not sufficient to cave in Burgess's skull. We find these to be distinctions without much of a difference. The fact remains that Burgess, like the victims in *Turner*, *Gollehon*, and *Sattler*, died from blunt force trauma to the head.

¶77. Johnson also argues that, unlike *Turner*, *Gollehon,* and *Sattler*, it cannot be said that Burgess was beaten after he was down. This argument is contradicted by the testimony of the State's forensic serologist, Julie Long, who concluded that the blood spatters on Johnson's pants were caused by applying force to a bloody object only 8 to 10 inches off of the floor.

¶78. Finally, Johnson attempts to distinguish this case by arguing that there was no indication that an attack was going to be made upon Burgess in advance, as was the situation in *Turner*, *Gollehon*, and *Sattler*. This argument is refuted by Johnson's own statements. At the July 9, 1996 hearing, Johnson's attorney introduced a letter written by Johnson wherein Johnson claimed that, three days prior to the attack on Burgess, he learned that another inmate was planning to beat up Burgess over money Burgess owed that inmate for drugs. While the District Court found this account of Burgess's death not credible, it is disingenuous for Johnson to argue on one hand that he knew an attack was going to be made upon Burgess in advance and, on the other hand, to attempt to distinguish *Turner*, *Gollehon,* and *Sattler* by contending that there was no indication that an attack was going to be made upon Burgess in advance.

¶79. Johnson argues that a sentence of death in his case would be disproportionate to sentences imposed on others who have been convicted of deliberate homicide while within MSP. Essentially, Johnson argues that his case should be compared to the "prison riot cases" ]where no death sentences were imposed even though the inmates convicted in those cases had previously been convicted of deliberate homicide. He argues that we should reconsider and reverse our decision in *Smith* so that we may consider other cases in which the death penalty was not sought or imposed. However, Johnson offers no persuasive reason for opening this Court's proportionality review to study other cases. Our reasoning in *Smith* remains sound; only when the death

penalty is sought will a record exist concerning aggravating and mitigating circumstances. *Smith*, 280 Mont. at 179, 931 P.2d at 1285.

¶80. Accordingly, we hold that Johnson's sentence is not excessive or disproportionate to the penalty imposed in similar cases.

## Conclusion

¶81. In summary, we hold that the District Court properly instructed the jury on "flight" and "concealment" and that there was sufficient evidence to support Johnson's conviction of deliberate homicide As to this Court's automatic review of the death sentence, we hold that the sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor; the evidence supports the District Court's findings of the nonexistence of mitigating circumstances; and the sentence is not excessive or disproportionate to the penalty imposed in similar cases. Therefore, we affirm Johnson's conviction and sentence.

¶82. Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ WILLIAM E. HUNT, SR.

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER

Justice W. William Leaphart, specially concurring.

¶83. I concur with the decision of the Court on issues one through four. For the reasons set forth in my special concurrence in State v. Smith (1996), 280 Mont. 158, 186-90, 931 P.2d 1272, 1289-92, I conclude, as to issue five (proportionality of the

**sentence), that under either the restricted *Coleman* standard or the more expansive standard which I espoused in *Smith*, the sentence imposed here was not out of proportion to similar cases.**

/S/ W. WILLIAM LEAPHART