No. 98-137

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 297

297 Mont. 111

991 P.2d 929

---

STATE OF MONTANA,

Plaintiff and Respondent,

v.

DARRELL DAVID HALL, JR.,

Defendant and Appellant.

---

APPEAL FROM: District Court of the Eighteenth Judicial District,

In and for the County of Gallatin,

The Honorable William Nels Swandal, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Helene Orenstein, Attorney at Law; Bozeman, Montana

No

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Pamela P. Collins,

Assistant Attorney General; Helena, Montana

Marty Lambert, Gallatin County Attorney; Bozeman, Montana

_____

Submitted on Briefs: May 13, 1999

Decided: December 6, 1999

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

1. ¶ By Information filed in the District Court for the Eighteenth Judicial District in Gallatin County, the Defendant, Darrell Hall, was charged with: aggravated assault, a felony in violation of § 45-5-202, MCA; assault in violation of § 45-5-201, MCA; obstructing a peace officer in violation of § 45-7-302, MCA; and unlawful possession of an intoxicant in violation of § 45-5-624, MCA. Following a jury trial, Hall was convicted of all the charged offenses except for the aggravated assault charge, on which the jury was unable to reach a verdict. Following a second jury trial on June 9, 1997, Hall was convicted of aggravated assault. On July 14, 1997, Hall moved for a new trial on the basis of newly discovered evidence. The District Court denied Hall's motion for a new trial. Hall appeals from the orders and judgment of the District Court. We affirm the District Court.
2. ¶ The following issues are presented on appeal:
3. ¶ 1. Did the District Court abuse its discretion when it denied Hall's motion for a directed verdict?

4. ¶ 2. Did the District Court abuse its discretion when it allowed the prior testimony of a prosecution witness to be read at Hall's second trial, pursuant to Rule 804(b), M.R.Evid.?

5. ¶ 3. Did the District Court err when it instructed the jury on flight evidence?

6. ¶ 4. Did the District Court abuse its discretion by denying Hall's motion for a new trial based on newly discovered evidence?

## FACTUAL BACKGROUND

7. ¶ Early in the evening of August 31, 1995, Hall and two friends, Duane Gobert and Manley Ankney, drove into Bozeman to shoot some pool and drink at the local bars. Bart Huber testified that at approximately 11:00 or 11:30 p.m., while he was in the men's bathroom in the Rocking R Bar, he witnessed Hall yelling and banging on the doors of the bathroom stall. Hall then came out of the stall and told Huber that he had a gun and a knife in his car. Shortly thereafter, Huber ran into Hall in the bar and an agitated Hall held a knife within inches of Huber's stomach and warned Huber that "people who fuck with me are going to die."

8. ¶ Around 1:00 a.m. Jamie Perlinski was outside the Rocking R Bar getting some fresh air. Perlinski had attended a bachelor party earlier in the evening, was intoxicated and was lying down on the sidewalk in front of the bar when Hall and Gobert approached him. Hall and Gobert each poured some beer on Perlinski's face. This angered Perlinski and a confrontation between Gobert and Perlinski ensued. Bozeman Police Officer Greg Megargel observed the confrontation and intervened, pulling Perlinski aside and asking him for an explanation. Perlinski explained that someone had poured beer on his face while he was lying down on the sidewalk. Officer Megargel then received another call and left the scene to respond.

9. ¶ Approximately ten minutes later, Hall, Gobert, and Ankney were again outside the Rocking R Bar. Perlinski and a group of his friends from the bachelor party also congregated outside the bar. Perlinski asked Gobert why he had poured beer on his face and Gobert responded by punching Perlinski. Perlinski's friend, Brandon Koslofsky, jumped at Gobert and wrestled him to the ground. Then Koslofsky and Gobert wrestled with each other on the ground for a minute or two. Meanwhile, the altercation between Koslofsky and Gobert drew a large crowd from the bar, which encircled the two. During the fight, Ankney was being restrained by Koslofsky's friend Brett White in order to keep him from intervening in the fight and witnesses spotted Hall moving around in the vicinity of Koslofsky and Gobert.

10. ¶ After Koslofsky and Gobert had been on the ground for a minute or two, someone

stepped in to break up the fight, and discovered that Koslofsky had been stabbed in the back with a knife. The knife was removed from Koslofsky's back and the Bozeman police were called. When the police arrived they placed Gobert under arrest and ordered everyone to remain at the scene. Ankney and Hall started to leave. Witnesses alerted the police that Ankney and Hall were leaving the scene, and that they had been a part of the altercation. Police officers stopped Ankney and Hall and asked them for identification. Hall produced a Blackfeet Indian Reservation ID bearing the name Gaylord Eugene Kipp and claimed that was his name. The officers then ordered Hall and Ankney to remain where they were.

11. ¶ At some point during their initial investigation that night, the officers were approached by Bart Huber who told them that earlier in the evening Hall had pulled out a knife in the bar and held it to Huber's stomach. Officers escorted Huber to the police car where Gobert was being held and asked Huber if Gobert was the one who used the knife to threaten him. Huber told the police that Gobert was not the same person. Huber gave the police a description of the man who had assaulted him. It fit the description of Hall.

12. ¶ The police looked back down the street where they had ordered Hall and Ankney to stay and noticed that only Ankney remained at that location. Subsequently, a police officer discovered Hall several blocks from the scene of the stabbing. The officer returned Hall to the scene where Huber identified Hall as the man who threatenend him with the knife earlier in the evening.

13. ¶ At this point, Bozeman police had both Hall and Gobert in custody. Gobert was under arrest for assault, but denied stabbing Koslofsky. Hall had been identified as the man who pulled the knife on Huber while in the Rocking R Bar earlier that evening. Of all the witnesses questioned by Bozeman police that night, no one saw who actually stabbed Koslofsky.

14. ¶ During the police department's subsequent investigation of the stabbing, Detective Darcy Dahle interviewed 42 people, however, none of them witnessed who actually stabbed Koslofsky. Detective Dahle's investigation did reveal that the knife Hall pointed at Huber in the bar was identical to the knife used to stab Koslofsky. Additionally, the witnesses generally described to the detective that it would have been difficult, if not impossible for Gobert to have stabbed Koslofsky, because Koslofsky was holding Gobert on the ground at the time he was stabbed.

15. ¶ Based upon the investigation of the Bozeman police department, the State filed an information charging Hall with aggravated assault for stabbing Koslofsky, along with four misdemeanor charges. Count I charged Hall with aggravated assault, for purposely or knowingly causing serious bodily injury to Koslofksy by stabbing

Koslofsky in the back with a knife. Count II charged Hall with misdemeanor assault for purposely or knowingly causing reasonable apprehension of bodily injury in Bart Huber by threatening Huber with a knife. Counts III and IV charged Hall with obstructing a peace officer for impairing or hindering the enforcement of a criminal law or the performance of a governmental function, for giving a false name to the police officers, and for failing to obey the officers' order to remain at a certain location. Count V charged Hall with unlawful possesion of an intoxicant, for knowingly consuming or possessing alcoholic beverages while being under the age of 19 years.

¶ On March 4, 1996, Hall's jury trial commenced for all five counts charged in the September 27, 1995 information. On March 11, 1996, the jury found Hall guilty of the four misdemeanor charges. The jury was unable to reach a verdict on the aggravated assault charge. The District Court declared a mistrial related only to that count, and on June 9, 1997, Hall was retried for aggravated assault and convicted.

¶ On July 14, 1997, Hall filed a motion for a new trial based on the discovery of new evidence. The District Court held a hearing to consider Hall's motion and heard testimony from three young men who had either directly heard or heard through other sources that Gobert stated that Hall was taking the blame for what Gobert had done. After listening to the witness testimony, the District Court denied Hall's motion for a new trial.

## DISCUSSION

## ISSUE 1

¶ Did the District Court abuse its discretion when it denied Hall's motion for a directed verdict?

¶ The standard of review that applies to a district court's denial of a motion for directed verdict in a criminal case is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Ross* (1995), 269 Mont. 347, 360, 889 P.2d 161, 169.

¶ At the conclusion of the State's evidence, Hall moved for a directed verdict of acquittal based on his contention that only circumstantial evidence had been offered and that, therefore, the law requires that there not be any reasonable theory of the Defendant's innocence.

¶ Section 46-16-403, MCA, provides:

When, at the close of the prosecution's evidence or at the close of all the evidence, the evidence is insufficient to support a finding or verdict of guilty, the court may, on its own motion or on the motion of the defendant, dismiss the action and discharge the defendant.The State charged Hall with aggravated assault in violation of § 45-5-202, MCA. Thus, in order to meet its burden, the State had to prove beyond a reasonable doubt that Hall purposely or knowingly caused serious bodily injury to Koslofsky. Hall argues that no rational trier of fact could have found beyond a reasonable doubt that Hall stabbed Koslofsky. Hall further asserts that the State's evidence was entirely circumstantial and that because the evidence of Hall's guilt was also subject to a reasonable interpretation supporting Hall's innocence, the District Court should have granted his motion for a directed verdict of acquittal.

22. ¶ Hall contends that the circumstantial evidence presented at his trial was subject to the reasonable interpretation that, Gobert, in fact, committed the stabbing and therefore the District Court should have granted his motion for a directed verdict. In support of his contention Hall cites *State v. Lucero* where we stated that:

[I]f the circumstantial evidence was susceptible to two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, it is the duty of the jury to adopt the interpretation which points to the defendant's innocence and reject that interpretation which points to his guilt.

*State v. Lucero* (1984)*,* 214 Mont. 334, 339, 693 P.2d 511, 513-14. However, this Court has more recently stated that "when circumstantial evidence is susceptible to two interpretations, one which supports guilt and the other which supports innocence, the trier of fact determines which is most reasonable." *State v. Arthun* (1995), 274 Mont. 82, 91, 906 P.2d 216, 221. Additionally, we have held numerous times that circumstantial evidence alone is sufficient to support a criminal conviction. *State v. Heffner*, 1998 MT 181, ¶ 30, 290 Mont. 114, ¶ 30, 964 P.2d 736, ¶ 30.

23. ¶ The testimony presented at trial established that the knife used to stab Koslofsky belonged to Hall's mother and was in Hall's possession until minutes before the stabbing. Ankney testified that the knife used to stab Koslofsky was the same knife that he and Hall had used on that afternoon to splice wires on a car stereo they were installing. Ankney further testified that Hall told him that the knife was his. Huber testified that between 11:00 and 11:30 that evening, Hall pulled out a knife and

pointed it within inches of Huber's stomach. Huber identified the knife used to stab Koslofsky as the same knife with which Hall had threatened him. Tom Labert testified that minutes before Koslofsky was stabbed, he spotted Hall outside in the vicinity of the Rocking R Bar, holding a knife that appeared to be the same knife used to stab Koslofsky. Thus, the testimony established that Hall was in possession of the knife until minutes before Koslofsky was stabbed.

24. ¶ Testimony of witnesses who observed the struggle between Gobert and Koslofsky established the relative positions of Gobert and Hall during the fight and the probability that Hall would have been the only person in a position to stab Koslofsky. Gobert testified that while he was on the ground wrestling with Koslofsky, Hall was standing right next to him. Ankney testified that while Brett White restrained him, he saw Hall in the crowd of people surrounding Gobert and Koslofsky, and Hall was trying to break up the fight. Bryant Higgs testifed that during the fight Gobert's hands were being held out at his sides by Koslofsky and that he did not see a knife in either of Gobert's hands.

25. ¶ Koslofsky's treating physician, Dr. Fred McMurry, testified that because the knife penetrated Koslofsky's spinal cord, the amount of force that was exerted must have been extraordinary. Dr. James Brady also testified that the wounds inflicted upon Koslofsky would have required the use of substantial force. The medical evidence was more consistent with the theory of Hall stabbing Koslofsky from behind, than with Gobert stabbing Koslofsky while wrestling with him.

26. ¶ Our review of the trial transcript reveals that when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that Hall committed the essential elements of this crime beyond a reasonable doubt. Therefore, we conclude that the District Court did not abuse its discretion when it denied Hall's motion for a directed verdict.

## ISSUE 2

27. ¶ Did the District Court abuse its discretion when it allowed the prior testimony of a prosecution witness to be read at Hall's second trial, pursuant to Rule 804(b)(1), M. R.Evid.?

28. ¶ Our standard of review of a district court's evidentiary ruling is whether the court abused its discretion. *State v. Hayworth,* 1998 MT 158, ¶ 28, 289 Mont. 433, ¶ 28, 964 P.2d 1, ¶ 28.

29. ¶ At trial, over the objection of Hall, the District Court allowed the testimony of Manley Ankney from Hall's first trial to be read into evidence pursuant to Rule 804

(b)(1), M.R. Evid, which provides:

(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding.

. . . .

(B) In criminal actions and proceedings, if the party against whom the testimony is now offered had an opportunity and similar motive to develop the testimony by direct, cross, and redirect examination.

30. ¶ Hall does not dispute the District Court's finding that Ankney was unavailable to testify at this trial, pursuant to Rule 804(a)(2) and (4), M.R. Evid. Additionally, Hall does not dispute that, under ordinary circumstances, former testimony is admissible as an exception to the hearsay rule. Rather, Hall asserts that the District Court erred when it assumed that Ankney's previous testimony was reliable. Hall contends that "under the unique circumstances of this case," he has been denied a full and complete right of confrontation.

31. ¶ Hall argues that, although the cross-examination in the first trial was adequate for that proceeding, new evidence came to the attention of Hall's counsel which was presented at retrial that rendered Ankney's prior testimony highly questionable. The new evidence presented dealt with an alleged conversation that took place in Hall's hotel room while the jury was deliberating during the first trial. Allegedly, Gobert and Ankney came to Hall's hotel room at which time Ankney told Hall "I took the knife away from you and I wasn't giving it back to you until you were a good boy." Hall's mother, Kathleen Evans, testified at this trial that she heard Ankney make that statement to Hall. Gobert testified on cross-examination that he also heard Ankney make this statement. However, on redirect, Gobert admitted that he did not know what Ankney said to Hall that evening.

32. ¶ Hall contends that because Ankney's prior testimony was questionable and lacked reliability, its use violated Hall's right to meet the witness face to face and to cross-examine him, which is an absolute right guaranteed by Article II, Section 24 of the Montana Constitution. Article II, Section 24, of the Montana Constitution, the counterpart to the Confrontation Clause of the United States Constitution, provides

that: "[i]n all criminal prosecutions the accused shall have the right to . . . meet the witnesses against him face to face . . . ."

33. ¶ Hall cites *Ohio v. Roberts,* (1980) 448 U.S. 56, in support of his contention that hearsay is admissible under the Confrontation Clause only if the statement at issue bears adequate indicia of reliability. In *Ohio*, the United States Supreme Court set forth a two_prong test for determining the admissibility of hearsay when the declarant is not available for cross-examination at trial. The first prong requires a showing of the declarant's unavailability. *Ohio,* 448 U.S. at 65. The second prong requires that the declarant's prior testimony bears adequate indicia of reliability. *Ohio,* 448 U.S. at 66. Hall argues that Ankney's testimony fails the second prong of this test and therefore violates the Confrontation Clause.

34. ¶ However, in addition to the test set forth in *Ohio*, the Supreme Court in *Ohio* stated the following:

The Court has applied this "indicia of reliability" requirement principally by concluding that certain hearsay exceptions rest upon such solid foundations that admission of virtually any evidence within them comports with the "substance of the constitutional protection" . . . In sum, when a hearsay declarant is not present for cross-examination . . . his statement is admissible only if it bears adequate "indicia of reliability". *Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.* In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Ohio*, 448 U.S. at 66 (emphasis added). In *Mancusi v. Stubbs* (1972), 408 U.S. 204, 213-16, the Supreme Court recognized that cross-examined prior testimony falls within one of the firmly rooted hearsay exceptions from which reliability of the statement can be inferred.

35. ¶ In Montana, prior testimony is also a recognized exception to the hearsay rule and is codified in our Rules of Evidence at Rule 804(b)(1). *City of Hamilton v. Mavros* (1997), 284 Mont. 46, 50, 943 P.2d 963, 966. The rationale behind the exception is that there is a guarantee of trustworthiness at the time the testimony is given, namely, the witness is under oath and subject to cross-examination. *City of Hamilton*, 284 Mont. at 50, 943 P.2d at 966.

36. ¶ In the instant case, we infer the reliability of Ankney's prior testimony from the facts that Ankney was under oath and subject to cross-examination at the time of his original testimony. While evidence may have surfaced after the first trial regarding

the alleged conversation in which Ankney stated he had taken the knife away from Hall before the stabbing, that evidence was presented to the jury through the testimony of Evans and Gobert. This evidence was available for the jury to weigh when contemplating the weight to give to Ankney's prior testimony.

37. ¶ Consequently, we conclude that admitting Ankney's prior testimony did not violate the confrontation clause. Accordingly, we conclude that the District Court did not abuse its discretion when it allowed Ankney's prior testimony to be read into evidence pursuant to Rule 804(b)(1), M.R. Evid.

## ISSUE 3

38. ¶ Did the District Court err when it instructed the jury on flight evidence?

39. ¶ The standard of review of jury instructions in criminal cases is whether the instructions, as a whole, fully, and fairly instruct the jury on the law applicable to the case. *State v. Johnson,* 1998 MT 289, ¶ 28, 969 P.2d 925, ¶ 28, 55 St.Rep. 1186, ¶ 28. Additionally, we recognize that a district court has broad discretion when it instructs the jury. *State v. Weaver,* 1998 MT 167, ¶ 28, 290 Mont. 58, ¶ 28, 964 P.2d 713, ¶ 28.

40. ¶ At trial, the State presented evidence and testimony that, following Koslofsky's stabbing, Hall left the scene of the crime, gave police officers false identification when they stopped him, did not remain at the location where police officers ordered him to stay, and was seen hiding in a bush prior to his arrest.

41. ¶ Based on this evidence and testimony, the District Court gave the following jury instruction:

If you are satisfied that a crime charged in the Information has been committed by someone, then you may take into consideration any testimony showing, or tending to show, flight by the defendant. This testimony may be considered by the jury as a circumstance tending to prove a consciousness of guilt, but is not sufficient of itself to prove guilt. The weight to be given such circumstance and significance if any, to be attached to it, are matters for the jury to determine.

The language of this flight instruction was taken verbatim from the Montana Criminal Jury Instructions (1990), published by the State Bar of Montana, and based upon the authority of *State v. Walker* (1966), 148 Mont. 216, 419 P.2d 300.

42. ¶ On appeal, Hall contends that the District Court erred when it instructed the jury

that evidence of flight was evidence of consciousness of guilt. Hall asserts that the State's evidence of Hall's flight was insufficient to support the use of this instruction. Hall additionally contends that this instruction is an unnecessary and prejudicial comment by the District Court on the evidence and urges this Court to reexamine the propriety of giving an instruction on flight. Moreover, Hall points out that the flight instruction is simply a particularization of the general instruction on circumstantial evidence and thus serves no true purpose, because even without the flight instruction, the State is free to use circumstantial evidence of flight to argue a defendant's guilt.

43. ¶ At trial, several witnesses testified regarding the facts which supported the District Court's flight instruction. Officer David Wolny testified that immediately after the police arrived at the scene of the stabbing and were beginning their initial investigation, witnesses alerted Officer Wolny that Hall and Ankney were leaving the scene and that they had been involved in the altercation. Officer Wolny further testified that when he stopped Hall and Ankney, Hall produced false identification; that he ordered Hall and Ankney to remain where they were while Officer Wolny returned to the crime scene; and that at some point within the next half hour, Officer Wolny looked at the area where he had ordered Hall and Ankney to remain, and noticed that only Ankney was there. Deputy Keith Farquhar testified that he drove around until he discovered Hall several blocks from the crime scene. Chris Ogle testified that, minutes before Deputy Farquhar discovered and subsequently arrested Hall, Ogle was walking down the street and Hall came out of some bushes and asked him if the police were gone.

44. ¶ Based on these facts, we conclude that there was ample evidence to support the District Court's flight instruction.

45. ¶ However, several jurisdictions follow the view that a jury instruction on flight is an unnecessary comment on the evidence by the trial court. *See People v. Larson* (1977), 194 Colo. 338, 572 P.ed 815, 817; *State v. Wrenn* (Idaho 1978), 584 P.2d 1231, 1233; *State v. Bone* (Iowa 1988), 429 N.W.2d 123, 125-27; *State v. Cathey* (1987), 241 Kan. 715, 741 P.2d 738, 748-49; *People v. Williams* (1985), 66 NY.2d 789, 497 N.Y.S.2d 902, 903, 488 N.E.2d 832, 833; *State v. Stilling* (1979), 285 Or. 293, 590 P.2d 1223, 1230, *cert. denied*, 444 U.S. 880, 100 S. Ct. 169, 62 L. Ed. 2d 110; *State v. Grant* (1980), 275 S.C. 404, 272 S.E.2d 169, 171; *State v. Menard* (S. D. 1988), 424 N.W.2d 382, 384. The Ninth Circuit committee which drafted its model jury instructions, expressed the view that instructions on evidence, such as flight, "aside from being unnecessary, . . . are undesireable in that they tend to inject argument into the judge's charge and lengthen it unnecessarily." Ninth Circuit

Model Jury Instructions (West 1995), at 49. In *United States v. Robinson* (1973 D. C.) 475 F.2d 376, 384, the court stated that:

Evidence of flight tends to be only marginally probative as to the ultimate issue of guilt or innocence. The interest of justice is perhaps best served if this matter is reserved for counsel's argument, with little if any comment by the bench.

46. ¶ In reconsidering the probative value of the flight instruction, we are thus persuaded that the better policy in future cases where evidence of flight has been properly admitted is to reserve comment to counsel, rather than the court.

47. ¶ However, in the instant case, we find no reversible error because there was sufficient evidence that flight had taken place and the instruction included the qualification that such flight is not by itself sufficient evidence of guilt but is only one circumstance to be considered by the jury. Section 46-20-701(1), MCA, provides that "[a] cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows that the error was prejudicial." *See State v. Maier*, MT 1999 51, 977 P.2d 298, 56 St.Rep. 208.

48. ¶ Accordingly, we conclude that the District Court's flight instruction did not prejudice Hall and therefore is not reversible error. We further conclude that the significance of a defendant's flight should be left to argument. Accordingly, we order that in all future trials instructions on the significance of flight should not be given.

## ISSUE 4

49. ¶ Did the District Court abuse its discretion by denying Hall's motion for a new trial based on newly discovered evidence?

50. ¶ The standard of review of a district court order granting or denying a new trial based on newly discovered evidence is abuse of discretion. *State v. Berger*, 1998 MT 170, ¶ 53, 290 Mont. 78, ¶ 53, 964 P.2d 725, ¶ 53.

51. ¶ On July 14, 1997, one month following Hall's conviction for aggravated assault, Hall filed a motion for a new trial based on newly discovered evidence. The new evidence was an alleged statement by Gobert that "Darrell Hall is taking the rap for what I did." In support of his motion, Hall presented the affidavit of Wyle Wells which stated that Wells, Sam Whitford, Jr., and Richard Bird were all present at the Cut Bank Town Pump store on June 14, 1997, at approximately 4:30 or 5:00 p.m. when Gobert made the alleged statement.

52. ¶ The District Court held a hearing to consider Hall's motion for a new trial on October 30, 1997. Wells testified that the information in his affidavit filed with the court was false, and that actually he had only heard about Gobert's alleged statement from someone else. Whitford also testifed at the hearing, stating that he had not heard Gobert say anything at the Town Pump. Whitford did testify that he thought he saw Gobert at the Town Pump on the evening in question. Bird was the only witness who testified that he heard Gobert make the statement: "don't say nothing, but I'm the one who stabbed him." Gobert testified that he did not make the alleged statement and was not present at the Town Pump on the evening in question.

53. ¶ The District Court denied Hall's motion immediately following the hearing and explained: "I don't see any credible evidence here whatsoever from any of the witnesses." In its subsequent written order denying Hall's motion, the District Court held that Hall failed to meet the six prongs of the test for a new trial based on newly discovered evidence, as set forth in *State v. Greeno* (1959), 135 Mont. 580, 342 P.2d 1052.

54. ¶ In *Greeno*, we established six criteria which must be considered in addressing a motion for a new trial based on newly discovered evidence:

(1) That the evidence must have come to the knowledge of the applicant since the trial; (2) that it was not through want of diligence that it was not discovered earlier; (3) that it is so material that it would probably produce a different result upon another trial; (4) that it is not cumulative merely -- that is, does not speak as to facts in relation to which there was evidence at the trial; (5) that the application must be supported by the affidavit of the witness whose evidence is alleged to have been newly discovered, or its absence accounted for; and (6) that the evidence must not be such as will only tend to impeach the character or credit of a witness.

*Greeno,* 135 Mont. at 586, 342 P.2d at 1055. In the instant case, the District Court determined that Hall had not met the third, fourth, and sixth *Greeno* criteria.

55. ¶ The third *Greeno* factor requires that the new evidence be so highly probative of the defendant's innocence that its introduction probably would produce an acquittal. *State v. Fina* (1995), 273 Mont. 171, 178, 902 P.2d. 30, 35. At the hearing on his motion for a new trial, Hall presented the testimony of several witnesses. However, only one witness, Bird, claimed to have heard Gobert make the statement that Hall was taking the rap for what Gobert had done. Gobert himself testified that he did not make the statement and that he was not at the Town Pump at the time of the alleged

statement. Additionally, the District Court did not find any of the witness testimony presented at the hearing credible. Accordingly, we conclude that the District Court was correct when it held that Hall did not meet the materiality criteria as set forth in *Greeno*.

56. ¶ Based upon our conclusion in *Fina*, 273 Mont. at 177, 902 P.2d at 34, that "[t]he *Greeno* criteria are stated in the conjunctive; thus, each must be established before a defendant is entitled to a new trial on the basis of newly discovered evidence," and based on our further conclusion, that of the *Greeno* criteria, that materiality is the most significant we deem it unnecessary to address whether the District Court correctly held that the fourth and sixth criteria were not satisfied, and conclude that the District Court did not abuse its discretion when it held that Hall was not entitled to a new trial.

57. ¶ For these reasons we affirm the judgment of the District Court.


/S/ TERRY N. TRIEWEILER



We Concur:

/S/ KARLA M. GRAY

/S/ JIM REGNIER

/S/ JAMES C. NELSON



Justice W. William Leaphart, dissenting.

58. ¶ I dissent on issue number two: "Did the District Court abuse its discretion when it allowed the prior testimony of a prosecution witness [Manley Ankney] to be read at Hall's second trial, pursuant to Rule 804(b)(1), M.R.Evid.?"

59. ¶ Hall objected to the court's allowing Manley Ankney's testimony from Hall's first trial to be read into evidence at the second trial. There is no dispute that Ankney met the unavailability requirement of Rule 804(b)(1), M.R.Evid. There is also no question that Ankney testified and was subject to cross-examination at the first trial. However, new evidence was presented at the retrial indicating that, after the testimony was completed in the first trial and the jury was deliberating, Ankney made the statement that he had taken the knife away from Hall before the stabbing. Evans and Gobert testified at the second trial that they overheard Ankney telling Hall, "I took the knife away from you and I wasn't giving it back to you until you were a good boy."

60. ¶ Hall contends that this subsequent statement by Ankney renders Ankney's trial testimony unreliable and that allowing Ankney's prior testimony to be read at the second trial denied Hall his right to confront Ankney through cross-examination, a right guaranteed by Article II, Section 24 of the Montana Constitution.

61. ¶ Prior testimony is a recognized exception to the hearsay rule and is codified in Rule 804(b)(1), M.R.Evid. This exception is based upon the assumption that the witness gave the prior testimony under oath and was subject to cross-examination. City of Hamilton v. Mavros (1997), 284 Mont. 46, 50, 943 P.2d 963, 966. Here, the majority infers the reliability of Ankney's prior testimony from the facts that Ankney was under oath and subject to cross-examination at the time of his original testimony. The Court also places considerable stock in the fact that the alleged conversation in which Ankney stated he had taken the knife away from Hall before the stabbing was presented at the second trial and thus the jury could factor in Ankney's statement when deciding what weight to give his prior testimony. The problem with this approach is that Ankney, the declarant, was not subject to cross-examination as to this subsequent statement, a statement which goes to the very heart of the case; i.e., whether Hall had the knife at the time of the stabbing. Although Ankney was cross-examined in the first trial, that cross-examination was only adequate for purposes of the first trial. The cross-examination was not meaningful, and certainly not complete, for purposes of the second trial because, given the chronology, the cross-examiner was not aware of Ankney's subsequent statement.

62. ¶ The Court points out that Evans and Gobert testified at the second trial as to Ankney's subsequent statement. However, that hearsay presentation denied Hall the

opportunity to effectively confront Ankney and denied the second jury the opportunity to observe Ankney under cross-examination as to his critical subsequent statement which cast serious doubt on the reliability of his prior testimony. This, in my view, violated Hall's right of confrontation under Article II, Section 24 of the Montana Constitution. I would reverse on this issue and affirm on issues one, three and four.

/S/ W. WILLIAM LEAPHART