No. 00-392

IN THE SUPREME COURT OF THE STATE OF MONTANA
2002 MT 26

STATE OF MONTANA,

Plaintiff and Respondent,

v.

PAMELA ELLIOTT,

Defendant and Appellant.

APPEAL FROM: District Court of the Sixteenth Judicial District,

In and for the County of Custer,

Honorable Gary L. Day, Judge Presiding

COUNSEL OF RECORD:

For Appellant:

Cynthia K. Thornton, Attorney at Law, Miles City, Montana

J. B. Wheatcroft, Attorney at Law, Miles City, Montana

For Respondent:

Honorable Mike McGrath, Attorney General, Helena, Montana

John P. Connor, Jr., and Barbara C. Harris, Assistant Attorneys

General and Special Deputy Custer County Attorneys, Helena, Montana

Colleen Magera, Custer County Attorney, Miles City, Montana

Submitted on Briefs: June 29, 2001
Decided: February 21, 2002

Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Appellant Pamela Elliott appeals from a jury verdict in the Sixteenth Judicial District Court, Custer County, finding her guilty of deliberate homicide. We affirm.

¶2 Elliott raises the following issues on appeal:

¶3 1. Did the District Court abuse its discretion in denying Elliott's motion to dismiss for lack of probable cause?

¶4 2. Did the District Court abuse its discretion in denying Elliott's motion to dismiss when it concluded that whether the infant was born alive or was stillborn was a factual determination to be made by the jury?

¶5 3. Did the District Court abuse its discretion in denying Elliott's motion for continuance?

¶6 4. Did the District Court abuse its discretion by allowing Garry Kerr to testify?

¶7 5. Did the District Court abuse its discretion by allowing Dr. Patrick Sauer to testify?

¶8 6. Did the District Court abuse its discretion by allowing the State to introduce into evidence and play at trial Elliott's tape recorded statement?

¶9 7. Was the burden shifted to Elliott to prove that the infant was stillborn in violation of Elliott's due process rights?

¶10 8. Was there sufficient evidence to support the jury's verdict of deliberate homicide?

FACTS

¶11 On June 10, 1998, Cheri Johnson, a friend of Pamela Elliott (Elliott), was told that Elliott was sick and needed to go to the doctor, but she would not. Johnson went to Elliott's house to check on her and found Elliott on the living room couch, covered with a bloody comforter. After Elliott assured Johnson that her father was coming in a few hours to take her to the doctor, Johnson left. Johnson returned a few hours later and called an ambulance.

¶12 Elliott told the emergency medical technician (EMT) who responded to the call that she had been undergoing chemotherapy for Hodgkin's disease. When she arrived at the hospital, she also told the physician's assistant, Arley Irish, that she was undergoing chemotherapy. Elliott told Irish that she had been bleeding vaginally for three or four days. After examination revealed the presence of a placenta, Irish asked Elliott about a pregnancy and baby. Elliott denied being pregnant.

¶13 Dr. Randall Rauh next examined Elliott and found her cervix dilated and placental tissue in the upper cervix. Rauh diagnosed a condition called "placenta accreta" whereby the placenta had grown into the uterine wall. Because infection had set in, Rauh performed an emergency hysterectomy. Rauh concluded that Elliott had given birth within a week or so prior to her emergency admission to the hospital. Elliott continued to deny having had a baby. Because no child was accounted for, Rauh notified the Custer County Sheriff's office.

¶14 The Sheriff's office began an investigation into the matter. Elliott was interviewed on June 22, 1998. She again denied that she had been pregnant and denied having a baby. She admitted that she had made up the story about having cancer, and she attributed her water retention to taking weight loss pills.

¶15 A search warrant was issued for Elliott's home on December 16, 1998, and Elliott was again interviewed by law enforcement officers. After being informed of her Miranda rights, Elliott initially maintained that she had not given birth to a baby. Later in the interview, she admitted having a baby in the bathroom of her house. She stated that she glanced once at the baby, then went back to bed. She returned some time later and put the baby in a bath towel and a plastic garbage bag. She then put it in a cupboard in her basement. This information was relayed to the officers conducting the search of Elliott's home, and the baby was found in that location. The body was wrapped in plastic bags

and a towel. Blood stains were found in three areas of the master bedroom and closet, on the living room couch and on the mattress in the master bedroom.

¶16 An autopsy of the baby was performed by Dr. Gary Dale, the State Medical Examiner. He found no placenta and a short umbilical stump that appeared to be cut. The soft tissues of the body had broken down and the body was partially decomposed. Dale also found fractures on both sides of the skull which he characterized as being the result of significant force and the most severe fractures he had seen in an infant or newborn. He stated that they were not the type of fractures suffered in the womb or during delivery. He further stated that if they had been inflicted on a newborn baby, they could cause death. Because of the decomposition and deterioration of the scalp, Dale could not determine whether there had been bleeding within the scalp or bruising of the scalp.

¶17 Based on the presence of ossification centers for the femurs and tibias, Dale concluded that the baby was approximately 40 weeks of gestational age and that the baby was developmentally viable. But, because of the decomposition of the body, Dale was unable to determine whether the baby ever maintained life independent from its mother or whether the skull fractures were sustained in life. He stated at trial that the baby's death was not accidental or natural.

¶18 Dr. Rauh reviewed Dr. Dale's report and testified at trial that the fractures documented in Dale's report were not consistent with fractures that, in his experience, occur during the vaginal delivery of a baby. He also testified that when a baby dies in the uterus, within twelve hours of death there is fluid accumulation in the brain, and the brain begins to liquify. If that occurs, the soft skull bones would move during delivery, but would not fracture.

¶19 Garry Kerr, an osteologist and forensic anthropologist who assists Dr. Dale, also testified at trial. Kerr examined the skull bones of the baby to determine whether the injuries occurred "in a normal fashion." Kerr found at least ten fractures of the skull bones, including fractures of both side (parietal) bones, the sphenoid at the base of the skull, and the left frontal bone.

¶20 Kerr concluded that the force that caused the fractures was not of the type that occurs during the normal birthing process and that the fractures appeared consistent with fractures from trauma at or about the time of death, rather than prior to or after death. Kerr also testified that he saw no evidence of nutritional deprivation nor genetic disorders that he is familiar with which could have caused the fractures. Kerr could not say whether the baby was born alive.

¶21 Dr. John Patrick Sauer, a pediatrician who regularly attends the birth and delivery of infants and has knowledge regarding neonatal and delivery issues, also testified at trial. He examined an x-ray from the autopsy and testified regarding the gestational age of the baby. He also testified about procedures that can be followed after the birth of a baby to ensure that the baby stays alive.

## PROCEDURAL BACKGROUND

¶22 On January 4, 1999, Pamela Elliott was charged by Information with the offense of deliberate homicide, a felony. Elliott filed a motion to dismiss the Information, claiming that the State had insufficient evidence to charge her. The District Court denied the motion. Elliott then filed a motion for continuance, claiming lack of time to secure an expert, in addition to other reasons. The District Court denied the motion and trial was held. The jury found Elliott guilty of deliberate homicide and the District Court sentenced Elliott to fifty years in Montana State Prison, with ten years suspended on conditions. Elliott appeals.

## DISCUSSION

¶23 Did the District Court err in denying Elliott's motion to dismiss for lack of probable cause?

¶24 Elliott argues that, because the State Medical Examiner was unable to establish a cause of the baby's death and unable to conclusively determine whether the baby was born alive, the Information was not supported by probable cause and the District Court erred in not granting the motion to dismiss. The State responds that the Information, read together with the affidavit, shows a probability that Elliott committed the acts charged.

¶25 Section 46-11-201, MCA, governs the filing of an information and provides in pertinent part:

> (1) The prosecutor may apply directly to the district court for permission to file an information against a named defendant. . . .
>
> (2) An application must be by affidavit supported by evidence that the judge or chief justice may require. If it appears that there is probable cause to believe that an offense has been committed by the defendant, the judge or chief justice shall grant leave to file the information, otherwise the application is denied.

¶26 The sufficiency of charging documents is established by reading the information together with the affidavit in support of the motion for leave to file the information. State v. Hamilton (1992), 252 Mont. 496, 499, 830 P.2d 1264, 1267. An affidavit in support of a motion to file an information need not make out a prima facie case that a defendant committed an offense. A mere probability that she committed the offense is sufficient. State v. Arrington (1993), 260 Mont. 1, 6, 858 P.2d 343, 346.

¶27 We review a district court's denial of a motion to dismiss for an abuse of discretion. Arrington, 260 Mont. at 7, 858 P.2d at 346.

¶28 Here, the affidavit stated that: (1) Elliott was transported to the hospital, critically ill with severe blood loss and that emergency surgery was performed by Dr. Rauh; (2) the surgery indicated that Elliott had recently been pregnant with a near or full term baby and the placenta remained in the uterus; (3) Elliott denied having a baby; (4) Elliott told the EMT that she had Hodgkin's disease and was receiving chemotherapy; (5) Elliott's mother told the EMT that Elliott's condition was from complications of an abortion; (6) a search warrant was issued for Elliott's house; (7) Elliott finally admitted giving birth and directed the police officers to the location of the baby's remains; (8) an autopsy revealed that the baby was well into the third trimester and was capable of viability; (9) the baby had severe skull fractures which could not have occurred during delivery and were likely not from an accident; (10) the umbilical cord was cut; and (11) the medical examiner could not determine whether the baby was stillborn.

¶29 Pursuant to § 45-5-102, MCA, "a person commits the offense of deliberate homicide if: (a) the person purposely or knowingly causes the death of another human being." A human being is defined as "a person who has been born and is alive." Section 45-2-101 (28), MCA.

¶30 Elliott argues that the State failed to prove that the baby was ever born alive, and, therefore, the Information should have been dismissed. However, to withstand a motion to dismiss, the State need only show a probability that the baby was born alive and that Elliott committed the offense charged.

¶31 We conclude that the affidavit sufficiently indicated a probability that Elliott committed the offense of deliberate homicide. The circumstances of the delivery of the

baby, Elliott's hospitalization, her differing stories, the skull fractures suffered by the baby, and the concealment of the baby's body, all provide a basis to find probable cause for the charge. The District Court did not abuse its discretion in denying Elliott's motion to dismiss the Information.

¶32 Did the District Court abuse its discretion in denying Elliott's motion to dismiss when it concluded that whether the infant was born alive or was stillborn was a factual determination to be made by the jury?

¶33 In its Order denying Elliott's motion to dismiss, the District Court stated:

> The Defendant bases her Motion to Dismiss on her claim that because the State Medical Examiner has not provided an opinion as to whether "Baby Girl Elliott" was stillborn or survived extrauterine life, the State cannot succeed in its charge of deliberate homicide because deliberate homicide requires proof of the death of a human being. . . .
>
> There is no doubt that the State has the burden of proving, beyond a reasonable doubt, each element of the offense of deliberate homicide to sustain a conviction in this matter. The State has indicated in its briefs and in its oral argument that it will present evidence on each and every element. Whether this evidence is sufficient for a jury to convict is a question only for that jury. It is inappropriate for the Court at this point to impose its views in territory that clearly belongs to the jury, that is, questions of fact.

¶34 On appeal, Elliott argues that "[b]y allowing the State to proceed to trial and allowing the jury to speculate as to whether or not 'Baby Girl Elliott' was born alive, the Court allowed the State to proceed without probable cause." We concluded above that there was probable cause for the Information, and the District Court correctly denied the motion to dismiss.

¶35 Elliott also states that an element of an offense may not be presumed by proof of remaining elements. She argues that the State, in violation of her due process right, relied on the presence of the dead infant to presume that the infant at some point sustained life. Once again, Elliott focuses on one piece of evidence to the exclusion of the others. The circumstances of the baby's delivery, the skull fractures and the concealment of the baby's body are all evidence that the jury may have relied on in finding Elliott guilty of deliberate homicide.

¶36 When circumstantial evidence is susceptible to differing interpretations, it is within the province of the jury to determine which will prevail. State v. Brady, 2000 MT 282, ¶ 28, 302 Mont. 174, ¶ 28, 13 P.3d 941, ¶ 28 (citing State v. Brodniak (1986), 221 Mont. 212, 222, 718 P.2d 322, 329; State v. Flack (1993), 260 Mont. 181, 189, 860 P.2d 89, 94; State v. Hall, 1999 MT 297, ¶ 22, 297 Mont. 111, ¶ 22, 991 P.2d 929, ¶ 22).

¶37 The factual issue of whether the baby was born alive is similar to other unresolved issues in a homicide case and is clearly a factual issue for the jury to decide. We conclude that the District Court correctly determined that whether the baby was born alive was a factual question for the jury.

¶38 Did the District Court abuse its discretion in denying Elliott's motion for continuance?

¶39 On Friday, November 19, 1999, one of Elliott's co-counsel filed a motion to continue the trial set for December 6, 1999. On the following Monday, the Court held a hearing on the motion. Although review of the Motion to Continue reveals that counsel stated she would be available for a hearing on the day that the hearing was held, counsel who drafted the motion later claimed she was unavailable, and, therefore, her co-counsel argued the motion. Elliott states in her brief that co-counsel was "not familiar with the issues or applicable law," thereby implying some prejudice to her in the "hurriedly" called hearing.

¶40 Of several issues raised in the original motion, Elliott appeals the denial of the motion to continue based only on defense counsel's inability to secure an expert witness. Elliott argues that it was error for the District Court to deny the motion and allow the trial to proceed without the defendant being able to obtain an expert witness when the State offered the testimony of four expert witnesses.

¶41 Section 46-13-202, MCA, governs motions for continuance and states, "All motions for continuance are addressed to the discretion of the trial court and shall be considered in the light of the diligence shown on the part of the movant. This section must be construed to the end that criminal cases are tried with due diligence consonant with the rights of the defendant and the prosecution to a speedy trial."

¶42 "Before a motion for a continuance is granted, the movant must show that he has employed due diligence to procure that which he now requests additional time to procure." State v. Walker (1987), 225 Mont. 415, 418, 733 P.2d 352, 354. In Walker, the defendant filed a motion for continuance because of witness unavailability. This Court stated that Walker assumed a dual burden in requesting a continuance. "First, he needed to show that he had reasonably searched for his witnesses. Second, he needed

to show that his witnesses' testimony could have helped his defense." Walker, 225 Mont. at 419, 733 P.2d at 355.

¶43 In her motion to the District Court, Elliott stated that she had consulted a doctor in Glendive, Montana, about serving as an expert for the defense, but that she was informed on November 17, 1999, that the doctor did not wish to serve as an expert or testify on her behalf. She stated that she did not believe she could proceed without an expert witness. She did not state whether she had contacted any other potential experts or how the expert testimony would have aided her defense.

¶44 In denying the request, the court noted that the trial had previously been continued at defense's request, that no reason was given why the expert was reluctant to appear and testify, that the matter had been pending for almost a year, and that Elliott had ample opportunity to arrange for witnesses.

¶45 The granting of a continuance by a district court is discretionary and not a matter of right with a defendant. Walker, 225 Mont. at 419, 733 P.2d at 355. Absent a clear abuse of discretion, we will not disturb a district court's denial of a continuance.

¶46 On appeal, Elliott argues that the District Court was "more concerned about preserving its schedule than fairness to the defendant." We disagree. In its Order, the District Court considered all the arguments Elliott raised, as well as the impact a continuance would have on the court's calender.

¶47 We hold that the District Court did not abuse its discretion in denying Elliott's motion for continuance.

¶48  Did the District Court abuse its discretion by allowing Garry Kerr to testify?

¶49  Garry Kerr, an osteologist and forensic anthropologist, testified at trial for the State. He examined the baby's bones and testified that the force that caused the fractures was not consistent with the normal birthing process and that the fractures appeared consistent with fractures from trauma at or about the time of death, rather than prior to or after death. Kerr also testified that he saw no evidence of nutritional deprivation nor genetic disorders that he is familiar with, which could have caused the fractures.

¶50 Elliott objected to Kerr's testimony at trial as irrelevant and cumulative. On appeal, she argues that Kerr's testimony was irrelevant because it was not included in the results of the post mortem examination issued by Dr. Dale. She directs this Court's attention to the United States Supreme Court statement in Kumho Tire Company, Ltd. v.

Carmichael (1999), 526 U.S. 137, 147, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238, 249, that trial courts have a gatekeeping obligation to ensure that all scientific testimony is "not only relevant, but reliable." Kumho Tire is clearly not on point. Kumho Tire concerned the question of whether the Daubert factors applied only to "scientific" testimony or to all expert testimony. Kumho Tire, 526 U.S. at 147, 119 S.Ct. at 1174, 143 L.Ed.2d at 249-50. Here, Kerr's testimony was scientific, and Elliott does not argue that it was unreliable.

¶51  Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, M.R.Evid.

¶52 "Questions of admissibility of evidence are left to the sound discretion of the trial court and will not be overturned absent a showing of abuse of discretion." State v. Stuit (1996), 277 Mont. 227, 230, 921 P.2d 866, 868.

¶53 The fact that Kerr's findings were not included in the post-mortem report does not support a finding of irrelevancy. Kerr's testimony concerned the skull fractures and when they were sustained and, as such, was clearly relevant to the issues of whether the baby was born alive and whether Elliott purposely or knowingly caused the baby's death. We hold that the District Court did not abuse its discretion by allowing Kerr to testify.

¶54 Did the District Court abuse its discretion by allowing Dr. Patrick Sauer to testify?

¶55 Dr. Sauer, a pediatrician, testified at trial regarding the gestational age of the baby. Elliott argues that Dr. Sauer's testimony should have been excluded as cumulative. She cites to Rule 403, M.R.Evid. for the proposition that "although relevant, evidence may be excluded if . . . [it is] needless presentation of cumulative evidence." (Emphasis added.) Elliott does not cite to any authority for the proposition that a district court's decision to admit cumulative evidence is error, nor does she argue that the court here abused its discretion in some way by admitting Sauer's testimony. She simply states that the testimony was cumulative; therefore, it was error to admit it.

¶56 Rule 23(a)(4), M.R.App.P., requires that appellant's argument "shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and pages of the record relied on."

¶57 Based on Elliott's failure to specify, as required by Rule 23, M.R.App.P., how the District Court abused its discretion, we affirm the District Court on this issue.

¶58 Did the District Court abuse its discretion by allowing the State to introduce into evidence and play at trial Elliott's tape recorded statement?

¶59 Elliott was interviewed on December 16 and 17, 1998, by Custer County Undersheriff Don Neese and Montana Department of Justice Agent Gary Hatfield. The interviews were tape recorded and played at the trial. Elliott raises three arguments supporting her position that the admission and playing of the tapes at trial was error: (1) that although the State had provided the defense with copies and transcripts of the tapes, she had no notice that the State was planning on playing the tapes at trial; (2) that the tapes reflected only part of Elliott's admissions; and (3) that the tapes contained objectionable matters within the recordings.

¶60 In support of her claim of lack of notice, Elliott notes that she reserved the right to suppress admissions or confessions at the Omnibus Hearing, held on April 6, 1999, and that the court included a handwritten notation on the Order stating "designate statement that will be used in case in chief at trial." Elliott implies that this imposed an affirmative duty on the State to notify her of its intention to play the tapes at trial.

¶61 Two months prior to the Omnibus Hearing, the State filed a notice that it would seek to introduce into evidence "any or all statements that may have been made by the Defendant relating directly or indirectly to the allegations contained in the Information, including, but not limited to, statements given to investigators and to persons other than investigators, that may be construed to be either a confession or admission." Elliott concedes in her brief that she was provided copies of the tapes and transcripts of the tapes during discovery and that "[e]vidence concerning the statements was certainly anticipated by Defense Counsel." The Omnibus Hearing Order clearly states that the defendant reserved her right to file a formal, written motion to suppress her admissions or confessions. Elliott had copies of the tapes and transcripts and yet did not file any motions to suppress all or part of the tapes. Her argument that she lacked notice in this regard is without merit.

¶62 Upon request, the State is required to give notice and produce all possible items of evidence. Section 46-15-322, MCA. The State fulfilled its duty by providing the tapes and transcripts to Elliott. The notation on the Omnibus Hearing Order did not, and could not, relieve defense attorneys of their duty to file appropriate motions to exclude any of the State's evidence which they felt was objectionable.

¶63 Elliott relies on Rule 106, M.R.Evid., to support her argument that the tapes were inadmissible because they did not reflect a complete record of the conversation that Agent Hatfield had with Elliott. Elliott does not argue that only a portion of the tapes were

played, but that the tapes themselves did not contain the entire interview. Elliott argues that "for a period of one hour and five minutes the interrogation of the defendant proceeded without the tape recorder being employed." At trial, Agent Hatfield testified concerning what occurred during the time the tape recorder was not operating.

¶64 Rule 106, M.R.Evid., states that "when part of [a] . . . recorded statement or series thereof is introduced by a party: an adverse party may require the introduction at that time of any other part of such item or series thereof which ought in fairness to be considered at that time."

¶65 "The completeness doctrine stems from the principle restricting the scope of cross-examination to matters testified to on direct examination. It broadens this principle by allowing an immediate introduction of the balance of portions of the same document, correspondence or conversation, where fairness so dictates." State v. Castle (1997), 285 Mont. 363, 374, 948 P.2d 688, 694. Rule 106 does not mandate inclusion of related evidence; it is allowed if it is needed to make the primary evidence understandable. State v. Whitlow (1997), 285 Mont. 430, 444, 949 P.2d 239, 248.

¶66 In this case, the completeness doctrine allowed Elliott to cross-examine Agent Hatfield concerning parts of his conversation with her that were not recorded. In fact, Agent Hatfield testified on direct examination by the State as to what occurred during the break. Elliott did not cross-examine him concerning that or other conversations, and again, she cannot now fault the State for her own failure to do so.

¶67 Elliott also objects to the playing of the tapes because of inadmissible matters contained within the recorded statements. She notes two of these statements on appeal: an offer to resolve the case through use of a specific criminal charge and reference to a statement by Elliott's mother that Elliott's condition on June 10, 1998, was the result of an abortion.

¶68 The State argues that these objections were not raised in the District Court and therefore should not be considered on appeal. We agree.

¶69 A lengthy discussion took place in chambers concerning Elliott's objections to the tapes being played. During that discussion, Elliott raised the issue of possible objectionable material within the tapes. The District Court directed Elliott to follow along with the transcript of the tapes and interpose objections at the appropriate time. There was also discussion directing the court reporter to begin transcribing if an objection was raised. In spite of these clear directions from the court, Elliott did not interpose any objections during the playing of the tapes.

¶70 "Failure to make a timely objection during trial constitutes a waiver of the objection." Section 46-20-104(2), MCA. This Court will not hold a district court in error when it has not been given an opportunity to correct itself. State v. Weeks (1995), 270 Mont. 63, 85, 891 P.2d 477, 490.

¶71 Again, Elliott had copies of the tapes and transcripts months before the trial. If there was objectionable material contained in the tapes, defense counsel had ample opportunity to either file a motion in limine or object at trial

¶72 Finally, Elliott argues in her Reply brief that the State and District Court incorrectly relied on the best evidence rule in admitting the tapes. She states that the best evidence rule concerns the authenticity of the exhibit, not the substance of the conversation. She directs this Court to United States v. Gonzales-Benitez (9th Cir. 1976), 537 F.2d 1051, for this proposition. In Gonzales-Benitez, the prosecution did not offer tape recordings into evidence. Instead, testimony was permitted relating to conversations that had been recorded. On appeal, the defendant argued that the tapes themselves were the "best evidence" of the conversations and therefore, the trial court erred in permitting the testimony. The Ninth Circuit noted that the "appellants simply misconstrue the purpose and effect of the best evidence rule," and ultimately stated that the tape recordings, if intelligible, "would have been admissible as evidence of those conversations. But testimony by the participants was equally admissible." Gonzales-Benitez, 537 F.2d at 1054.

¶73 In this case, in response to Elliott's argument at trial that the tapes do not "reflect the true, best evidence," the District Court stated, "this is an admissible statement by an opposing party, and I believe it is the best evidence." The court also made clear to defense counsel that she could cross-examine Agent Hatfield concerning the making of the tapes as well as all material discussed on the tapes.

¶74 We agree with the Ninth Circuit's decision in Gonzales-Benitez that the best evidence rule concerns the authenticity of the exhibit and not the substance of the conversation. Defense counsel does not argue that the tapes were not authentic copies and admitted during trial that they did not travel to Helena to authenticate the copies of the tapes, and also stated that they "have been lax from a monetary standpoint of trying not to have undue expense to the taxpayers of this county, . . . probably at certain times to our client's detriment." Therefore, Gonzales-Benitez does not support their argument that the tapes were wrongly admitted. In fact, it confirms that in this case, the tapes were admissible.

¶75 The tape recordings were correctly admitted. We hold that the District Court did not abuse its discretion by allowing the tape recordings to be played at trial.

¶76 Was the burden shifted to Elliott to prove that the infant was stillborn in violation of Elliott's due process rights?

¶77 Elliott contends that the State had no conclusive evidence, to a reasonable degree of medical certainty, that the baby was born alive, "and the closest the State could come would be to have the jury presume that there was a life and then to provide to the jury their theory that the life was terminated by the defendant." In arguing that this impermissibly shifted the burden to her to prove that the baby was stillborn, Elliott relies on Sandstrom v. Montana (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39. The Sandstrom decision established that "a jury instruction which shifts to the defendant the burden of proof on a requisite element of mental state violates due process." State v. Luchau, 1999 MT 336, ¶ 14, 297 Mont. 415, ¶ 14, 992 P.2d 840, ¶ 14. Although Elliott concedes that the present case does not involve jury instructions, she still insists that there was an impermissible presumption that the baby was born alive.

¶78 The State argues that it had the burden of proving all elements of the crime beyond a reasonable doubt and that nothing changed or diminished the burden in this case. We agree. The question of whether the baby was born alive was a question of fact which the State was required to prove beyond a reasonable doubt and the jury was instructed as such.

¶79 The jury heard evidence relating to the age of the placenta, the age of the baby, the skull fractures and Elliott's inconsistent stories about the birth. The jury was instructed that the State had the burden of proving Elliott's guilt beyond a reasonable doubt and that Elliott is presumed innocent. Instruction No. 10 stated that, "to convict the Defendant of Deliberate Homicide, the State must prove the following elements: 1. That the defendant caused the death of Baby Girl Elliott, a human being; and 2. That the Defendant acted purposely or knowingly." Instruction No. 11 stated, "A human being means a person who has been born and is alive."

¶80 This case certainly presented a difficult and unusual fact finding mission for the jury. In most deliberate homicide cases, the factual issue of life is not before the jury. But it was here, and the jury was correctly instructed. There was no presumption of life. Both parties' closing arguments centered on this issue in particular. In the beginning of the State's closing argument, the prosecutor stated, "The real point of contention is whether or not the Defendant purposely or knowingly caused that death, and in that context, whether she was born alive or not. That's the real crux of the issue. Was this baby born

alive or was she not?"

¶81 In her closing, Elliott emphasized this same issue, "This case is really not about death, it's about life. And that is whether or not the State of Montana can prove that this child was ever born alive, which I think is a very basic threshold issue here today."

¶82 The State was required to prove beyond a reasonable doubt that the baby was born alive and the jury was correctly instructed as such.

¶83 We hold that there was no burden shifting in this case and Elliott's due process rights were not violated.

¶84 Was there sufficient evidence to support the jury's verdict of deliberate homicide?

¶85 Elliott bases her argument that there was insufficient evidence to support the jury's verdict of deliberate homicide on the fact that the State produced no witness who could say "to a reasonable degree of medical certainty" that the baby was born alive. Once again, Elliott focuses on this one fact to the exclusion of all the other evidence brought forth at trial.

¶86 In determining the sufficiency of the evidence, this Court determines, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Richards (1995), 274 Mont. 180, 184, 906 P.2d 222, 224. "It is within the province of the finder of fact to weigh the evidence presented and determine the credibility of the witness; in the event of conflicting evidence on factual issues, the trier of fact determines which will prevail." State v. Johnson, 1998 MT 289, ¶ 41, 291 Mont. 501, ¶ 41, 969 P.2d 925, ¶ 41 (citations omitted). We review a jury verdict only to determine whether there was sufficient evidence, not to determine whether there was evidence to support a different verdict. Johnson, ¶ 41.

¶87 As stated above, deliberate homicide requires that the State prove beyond a reasonable doubt that Elliott purposely or knowingly caused the death of a human being. Although there was no direct evidence that the baby was born alive, there was sufficient circumstantial evidence to support the jury's verdict. "Circumstantial evidence alone is sufficient to obtain a conviction. Circumstantial evidence must only be of such a 'quality and quantity as to legally justify a jury in determining guilt beyond a reasonable doubt,' and all the facts and circumstances must be considered collectively." Johnson, ¶ 43 (citations omitted).

¶88 Here, the testimony established that Elliott hid her pregnancy from her friends and co-workers, that she told a friend she had food poisoning in June before giving birth, that she delivered the baby in the bathroom of her home without calling for assistance before or after delivery, that she wrapped the baby in a towel and put her in garbage bags on the shelf in her basement, that even after undergoing an emergency hysterectomy Elliott continued to deny the pregnancy, and that when the baby was found it was of viable gestational age and had sustained multiple skull fractures.

¶89 It was the jury's function to weigh all the evidence presented, to judge the credibility of witnesses and to decide the factual issue of whether the baby was born alive. We hold that there was sufficient evidence to support Elliott's conviction on the charge of deliberate homicide.

¶90 The conviction is affirmed.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY

/S/ PATRICIA COTTER

/S/ JAMES C. NELSON

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER

/S/ JIM RICE